**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

MAHMOUD KHALIL; MOHAMMAD IBRAHIM ZUBAIRI; and SIPA PALESTINE WORKING GROUP;

*Plaintiffs*,

v.

COLUMBIA UNIVERSITY IN THE CITY OF NEW YORK; THE TRUSTEES OF COLUMBIA UNIVERSITY IN THE CITY OF NEW YORK; and KEREN YARHI-MILO, in her capacity as the Dean of Columbia University School of International and Public Affairs,

*Defendants*.

Case No.1:26-cv-7977

**COMPLAINT AND JURY TRIAL DEMAND**

Dated: September 13, 2026

**Table of Contents**

NATURE OF THE CASE .......... 1
JURISDICTION AND VENUE .......... 4
PARTIES .......... 5
STATEMENT OF FACTS .......... 6
I. Allegations Pertaining to All Plaintiffs .......... 6
A. Defendants fostered an environment of hostility towards students who held pro-Palestine views and who were perceived as being Muslims, Arabs, non-citizens, and/or immigrants. .......... 6
B. Defendants were deliberately indifferent to a coordinated doxxing campaign that targeted PWG members. .......... 10
C. Defendants continued to engage in and facilitate the harassment and doxxing of PWG members, culminating in ICE illegally kidnapping and detaining Mr. Khalil. .......... 14
II. Additional Allegations Relating to Individual Plaintiffs .......... 27
A. Plaintiff Mahmoud Khalil .......... 27
B. Plaintiff Mohammad Ibrahim Zubairi .......... 33
III. Additional Allegations Relating to Non-Party PWG Members .......... 34
A. PWG Member A: Tariq Kenney-Shawa .......... 34
B. PWG Member B: Jasmine Dakhil Sarryeh-Jemersic .......... 36
C. PWG Member C: Bhavana Bellamkonda .......... 38
D. PWG Member D: Tasfia Arshad .......... 39
E. PWG Member E: Anonymous .......... 40
F. PWG Member F: Anonymous .......... 42
G. PWG Member G: Carly Shaffer .......... 43
H. PWG Member H: Danial Saiyid .......... 44
I. PWG Member I: Anonymous .......... 44
J. PWG Member J: Miriam Yousaf .......... 45
K. PWG Member K: Phillip Crane .......... 46
L. PWG Member L: Anonymous .......... 46
M. PWG Member M: Lucas Brooks .......... 47
CAUSES OF ACTION .......... 47
COUNT I .......... 47
COUNT II .......... 49
COUNT III .......... 51
COUNT IV .......... 52

COUNT V ..... 53
COUNT VI ..... 55
PRAYER FOR RELIEF ..... 55

# COMPLAINT

Plaintiffs MAHMOUD KHALIL, MOHAMMAD IBRAHIM ZUBAIRI, and SIPA PALESTINE WORKING GROUP ("SIPA PWG" or "PWG"), (collectively, "Plaintiffs"), by and through their attorneys, hereby allege as follows:

## NATURE OF THE CASE

1. This case concerns Defendants' deliberate indifference towards and failure to respond to instances of severe, persistent, and coordinated harassment directed towards Mahmoud Khalil, Mohammad Ibrahim Zubairi, and other members of SIPA Palestine Working Group due to their pro-Palestine advocacy and affiliation, their perceived shared ancestry as Arab and/or Muslim students, their national origin, and/or their status as non-citizen immigrants, as well as Defendants' subsequent retaliation against Mr. Khalil, Mr. Zubairi, and PWG and its members for reporting that harassment. Defendants' deliberate indifference towards this harassment enabled the coordinated, persistent doxxing of multiple PWG members and directly led to Mr. Khalil's March 8, 2025, illegal detainment and attempted deportation by U.S. Immigration and Customs Enforcement ("ICE").

2. Since PWG's formation at Columbia University's School of International and Public Affairs ("SIPA") in 2018, its members have been antagonized and harassed without consequence because of their vocal support of Palestine, perceived shared Arab and/or Muslim ancestry, and status as non-citizens and/or immigrants.

3. In the weeks following October 7, 2023, on-campus harassment and hostility directed towards PWG, its members, and other similarly situated students escalated to an extreme level. That harassment and hostility included: (1) the targeted doxxing attacks of PWG members by outside groups, facilitated by Columbia University students and faculty, which involved the

public display of targeted students' names and photographs on websites and on a box truck driving around the Columbia University campus; (2) the targeted and persistent peer-on-peer harassment and threatening of PWG members on SIPA's campus and in school-sponsored group chats; (3) Defendants falsely characterizing PWG as a hostile group in an effort to foster ill-will towards its members and to justify limiting PWG's on-campus presence and events; and (4) Defendants' eventual baseless suspension of PWG as a student organization, which persists to this day.

4. As student protests continued into the Spring 2024 semester, Defendants became increasingly complicit in tolerating and fomenting a campus atmosphere that was rife with harassment. Contrary to decades of articulated principles, Columbia University deployed intrusive surveillance mechanisms against its own students, called the New York Police Department onto campus to clear and arrest students participating in encampments, and engaged in mass disciplinary proceedings to punish students for their vocal support of Palestine, perceived shared Arab and/or Muslim ancestry, and status as non-citizens and/or immigrants. Defendants' behavior exhibited shockingly callous disregard for the rights and safety of Palestinian students, including Mr. Khalil and other PWG members.

5. Fearing for their safety, Mr. Khalil, Mr. Zubairi, and other PWG members repeatedly reported these instances of harassment and doxxing to Columbia University officials, including directly to SIPA's dean, Karen Yarhi-Milo ("Dean Yarhi-Milo"), for over five months. Defendants failed to respond to those reports or take appropriate action to extinguish the severe, pervasive, and objectionably offensive harassment targeting Mr. Khalil, Mr. Zubairi, and other PWG members, and instead retaliated against PWG, unreasonably interfering with their ability to function as a student organization by repeatedly characterizing its events as security risks. Those actions directly led to further on-campus harassment against pro-Palestine advocates and students

perceived as sharing Arab and/or Muslim ancestry or as being non-citizen immigrants.

6. Mr. Khalil repeatedly made reports of the harassment and violence directed towards him, Palestinian students, and others throughout his time at SIPA, beginning during the Spring 2023 semester and continuing for nearly two years. Those reports culminated on March 7, 2025, when Mr. Khalil emailed Columbia's interim president, Katrina Armstrong, and other SIPA administrators, desperately urging the school to take immediate action to protect its international students, including PWG members. Defendants again failed to take appropriate action.

7. One day later, on March 8, 2025, Mr. Khalil was illegally abducted by plainclothes ICE officers at his Columbia-owned residential apartment building. He endured 104 days of illegal detainment in an ICE facility in Jena, Louisiana before his release on bail on June 20, 2025. Throughout his detainment, Defendants refused to correct disinformation surrounding the nature of Mr. Khalil's role as a negotiator and mediator during the student protests, allowing a false narrative about his conduct and role to persist and further enabling peer-on-peer harassment of other Palestinian students and students with perceived shared Arab and/or Muslim ancestry,

8. During Mr. Khalil's detainment, Mr. Zubairi and other PWG members were subjected to ongoing peer-on-peer harassment for showing support for Mr. Khalil and demanding Defendants take action to protect similarly situated students. PWG members again reported these instances of harassment to Defendants, who took no appropriate corrective action against the harassers, and instead retaliated against PWG and its members.

9. Throughout the relevant time period, Defendants' failure to respond to Mr. Khalil's, Mr. Zubairi's, and other PWG members' legitimate reports of ongoing harassment and violence, and the retaliatory actions they actively took in response to these reports, placed PWG members at risk of violence and caused sustained, ongoing harm in violation of both federal and state laws.

Defendants (1) unjustifiably deprived Plaintiffs of the rights and protections guaranteed to them under Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d by denying PWG and its members the full benefit of their education; (2) violated the implicit protection against retaliation included in the text of section 601 of Title VI, 42 U.S.C. § 2000d; (3) violated New York Executive Law § 296(4) by permitting the harassment of PWG members on the basis of their status as Muslim and/or Arab students; their national origin as Palestinian individuals and/or their affiliation with Palestine; and their status as non-citizens and/or immigrants; and (4) breached the express and implied contractual obligations they owed to Plaintiffs pursuant to both Columbia's Anti-Discrimination Policy and its Discriminatory Harassment Policy and Procedures for Students by failing to ensure that Plaintiffs would be able to engage in academic pursuits without serious intrusion on their ability to study.[1] Those students now seek redress.

## JURISDICTION AND VENUE

10. This Court has subject matter jurisdiction under 28 U.S.C. §§ 1331 and 1343 over claims arising under Title VI of the Civil Rights Act of 1964 ("Title VI") (42 U.S.C. § 2000d *et seq.*).

11. This Court has supplemental jurisdiction over Plaintiffs' related state law claims under 28 U.S.C. § 1367(a) because those claims arise out of the same case or controversy as Plaintiffs' federal claims.

12. This Court has personal jurisdiction over Defendants because they are based out of and operate in the state of New York. Defendant Keren Yarhi-Milo, in her official capacities, is

---

[1] *See Anti- Discrimination and Discriminatory Harassment Policy and Procedures for Students*, Columbia University (effective September 30, 2025), https://universitypolicies.columbia.edu/content/anti-discrimination-and-discriminatory-harassment-policy-and-procedures-students; *see also Non-Discrimination Statement and Policy,* Columbia University, Faculty Handbook (last updated May 26, 2026), https://facultyhandbook.columbia.edu/content/columbia-universitys-non-discrimination-statement-and-policy.

located on SIPA's campus in New York, New York, and, as such, this Court has personal jurisdiction over her in this capacity.

13. This Court has the authority to provide preliminary and permanent injunctive relief pursuant to Rule 65 of the Federal Rules of Civil Procedure.

14. Venue in the Southern District of New York is proper under 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in its judicial district and Defendants are located within this District.

## PARTIES

15. Plaintiff Mahmoud Khalil ("Mr. Khalil") is a lawful permanent resident of the United States of America. He is married to a U.S. citizen and father to a one-year-old son. Mr. Khalil is of Palestinian origin, holds an Algerian passport, and identifies as both Arab and Muslim. Mr. Khalil is deeply committed to international human rights and public service. Between 2023 and 2025, Mr. Khalil was a SIPA student and served as the president of PWG.

16. Plaintiff Mohammad Ibrahim Zubairi ("Mr. Zubairi") is a citizen of Pakistan. Mr. Zubairi identifies as Muslim. From 2024 through 2026, Mr. Zubairi was enrolled as a student at SIPA. He is the current president of PWG.

17. Plaintiff SIPA Palestine Working Group ("SIPA PWG" or "PWG") is a student organization that was formally registered in accordance with Columbia University's applicable policies in 2018. It operates pursuant to bylaws and is governed by an executive board elected by fellow members. Membership in PWG is lifelong, *i.e.,* even after graduating from SIPA, individuals are still considered PWG members.

18. Defendant Columbia University in the City of New York ("Columbia University" or "Columbia") is a private, higher-education institution. Columbia maintains and operates a

university campus in the Morningside Heights neighborhood of New York City, located at 420 W 118th Street, New York, New York 10027, on which its School of International and Public Affairs ("SIPA") is located and where the actions alleged herein primarily occurred. Columbia receives substantial federal government funding and is a place of public accommodation.

19. Defendant Dean Keren Yarhi-Milo ("Dean Yarhi-Milo") is the dean of SIPA at Columbia University and has served in this position since July 2022. Dean Yarhi-Milo is sued herein in her official capacity.

20. Defendant Trustees of Columbia University in the City of New York (individually, "Trustees," or, collectively, alongside Columbia University and Dean Yarhi-Milo, "Defendants"), is a 501(c)(3) organization that functions as Columbia's primary governing body.

## STATEMENT OF FACTS

### I. Allegations Pertaining to All Plaintiffs

#### A. Defendants fostered an environment of hostility towards students holding pro-Palestine views, who were perceived as being Muslims, Arabs, non-citizens, and/or immigrants, and others for their association with those students.

21. PWG has been a registered student organization at SIPA since 2018. It was formed for the purpose of promoting awareness and advocacy regarding issues affecting the nation of Palestine, Palestinian people, and broader Muslim and Arab communities.[2]

---

[2] In full, SIPA PWG's mission statement reads as follows:

> Our group represents a new effort to raise awareness, increase understanding, and promote engagement among the SIPA and Columbia student body on Palestine. We meet, organize, and advocate in order to encourage a more holistic understanding of Palestine, with specific attention devoted to the political, social, economic, cultural, historical, and legal circumstances that have influenced the past and shape the future. Our goal is to serve as a source of information and a means of education on an issue that is often absent from academic and social life at SIPA. To reach these goals, we seek to provide SIPA students, and all who participate in our events, with exposure to Palestinian perspectives. Our events include speaking engagements by leading political and intellectual figures in Palestine and related issues, the hosting and co-sponsoring of cultural activities, and potential opportunities for tourism and travel in Palestine. Through these events and others, we address the topics of human and civil rights in contemporary Palestine, the nature and

22. Since its inception, PWG has proudly proclaimed its pro-Palestine stance. For example, on May 19, 2018, as one of its first official acts, PWG co-signed a statement wherein it condemned Israeli soldiers' act of murdering sixty Palestinian civilians.[3]

23. Defendants have long perceived PWG members as having shared Arab and/or Muslim ancestry because of PWG's vocal support of Palestine. Defendants also have a history of disingenuously conflating PWG's pro-Palestine stance with antisemitism.

24. Defendants have also been long been aware that PWG's perceived shared ancestry based on its pro-Palestine views and Palestinian advocacy have subjected it to on-campus harassment by other Columbia students and faculty members.

25. For example, in Spring 2022, SIPA students wearing a keffiyeh, a traditional Arab and Muslim scarf that is considered a symbol of Palestinian solidarity, were harassed by fellow students who referred to the keffiyeh as "what terrorists wear."

26. Also in Spring 2022, PWG was forced to reschedule Palestine Trek ("PalTrek"), an annual trip to Palestine that PWG had organized and ran without incident for Columbia University students since 2019, due to hostilities and complaints about the trip from other Columbia students.

27. In July 2022, Defendant Trustees appointed Defendant Keren Yarhi-Milo, an Israeli-American citizen and former Israeli military intelligence official,[4] as SIPA's dean. Dean Yarhi-Milo used her role as dean to take several actions that caused the on-campus harassment of and hostility towards Muslim and/or Arab, outwardly pro-Palestine students to notably worsen.

---

characteristics of historical and contemporary Palestinian identity, and the role of policy and a SIPA education in present-day circumstances, particularly the Occupation and struggle for liberation.

[3] *Columbia University student groups' statement about the killing of 60 Palestinians in the Gaza Strip,* The Morningside Post (May 18, 2018), https://morningsidepost.com/articles/2018/5/18/columbia-university-student-groups-statement-about-the-killing-of-60-palestinians-in-the-gaza-strip.

[4] Keren Yarhi-Milo and Amaney Jamal, *The Discourse is Toxic. Universities Can Help*, The New York Times (Oct. 30, 2023), https://archive.is/bZ5lG.

28. For example, in Spring 2023, PWG planned an educational event titled "Travel to Israel and Palestine: What to Know Before You Go." Without justification, Columbia University and Dean Yarhi-Milo subjected PWG to heightened "special event" approval requirements not imposed on other student groups not affiliated with Muslim and/or Arab ancestry.

29. PWG conceded to the additional "special event" requirements to allow the event to proceed. Nonetheless, on the day of the event, Defendants dispatched Public Safety officers to monitor the individuals in attendance. Public Safety acts as on-campus police personnel at Columbia University.

30. PWG had never before had an instance of violence occur at any of its gatherings that would have justified the oversight of Public Safety at this event.

31. Because Public Safety was known to have previously engaged in confrontations with students, their presence and intense surveillance understandably made PWG members feel uncomfortable and fearful and discouraged other SIPA students from attending.

32. Also in Spring 2023, PWG planned an event featuring Omar Shakir ("Mr. Shakir"), then the Israel and Palestine Director at Human Rights Watch. To advertise the event, PWG posted flyers around SIPA's campus, in full compliance with SIPA's Bulletin Board Policy. In an effort to intimidate and antagonize PWG, fellow SIPA students and/or community members repeatedly tore down these flyers.

33. PWG repeatedly reported these instances of harassment. Nonetheless, Defendants made no effort to investigate the alleged misconduct.

34. Instead, Defendants threatened to cancel the Omar Shakir event because they had baselessly determined that the gathering posed a "security risk." Only after Defendants could find no legitimate basis to cancel the event did they relent and allow PWG to host Mr. Shakir.

35. However, on the day of the event, Defendants once again dispatched Public Safety, instructing that they check and scan each attendees' ID and otherwise surveil the event. Once again, the presence and intense surveillance by Public Safety intimidated PWG members and discouraged other SIPA students from attending.

36. As Israel's attacks on Gaza escalated throughout the Fall 2023 semester, Columbia University students began organizing a series of student protests opposing Columbia's institutional support for the destruction of Gaza.

37. Immediately thereafter, animosity towards pro-Palestine students significantly escalated, heightening the anti-Palestinian, Islamophobic, and anti-Arab sentiments that had already permeated across Columbia's campus. Students who were perceived as being Arabs, Muslims, immigrants, and/or non-citizens were routinely labeled as violent aggressors and terrorists by Columbia University students, faculty, and staff members.

38. Defendants either deliberately ignored or encouraged and enabled the overtly bigoted behavior of its students and staff and took deliberate action to exclude PWG and its members from on-campus activities.

39. For example, on October 9, 2023, PWG sent an email to leadership at SIPA's Institute for Global Politics ("IGP"), including to Dean Yarhi-Milo, to request that Palestinian voices be included in an upcoming "Assessing Israel's Next Moves" panel sponsored by SIPA. This panel was intended to acknowledge the October 7, 2023, attacks and Israel's disproportionate military response. PWG wrote in the email that failing to include a Palestinian perspective would amount to "another example of SIPA's continuous Palestinian erasure in academic spaces." Yet, without explanation, pro-Palestine viewpoints were excluded from the panel.

40. Likewise, a PWG member reported to SIPA Student Affairs that a flyer advertising

its annual PalTrek trip had been torn down in the SIPA café area. Again, neither Defendants, nor any member of SIPA leadership, further investigated the report, nor disciplined the responsible individual.

**B. Defendants were deliberately indifferent to a coordinated doxxing campaign that targeted PWG members.**

41. On October 9, 2023, PWG signed a joint statement[5] wherein PWG, on behalf of its members and alongside other Columbia University Palestine solidarity groups, condemned the Israeli murder of Palestinian civilians following October 7, 2023, and called for Defendants to reassess their ties with Israel.

42. On October 13, 2023, PWG members informed Dean Yarhi-Milo that students at Harvard University who had signed a similar statement were actively being doxxed and subjected to horrific threats and accusations,[6] reasonably leading them to fear being similarly doxxed and harassed in retaliation for the group having signed the joint statement. PWG asked that SIPA: (1) remove PWG members' personal information and photos from public forums; and (2) hide PWG's officer list from CampusGroups, the password-protected platform that Defendants used as a directory for student organizations and their members.

43. Defendants took neither of the requested actions. Instead, on October 13, 2023, Dean Yarhi-Milo – recklessly, and without any regard for the fact that PWG members had just told her that they feared being doxxed and consequently harmed – published an article in The Atlantic

[5] *Joint Statement from Palestine Solidarity Groups at Columbia University regarding the recent events in Palestine/Israel: Oppression Breeds Resistance*, available at https://docs.google.com/forms/d/e/1FAIpQLSeHe5p0in9g4h9xURoTx6NPn-v2rb-m7k6ZIm4YNGqOPRVsFQ/viewform (last visited Sept. 9, 2026).

[6] Max J. Krupnick, *Two Years of Doxxing at Harvard*, Harvard Magazine (Aug. 8, 2025), https://www.harvardmagazine.com/university-news/harvard-doxxing-free-speech.

that repeatedly framed Arabs as "the enemy".[7] Defendants then amplified Dean Yarhi-Milo's article by publishing it on SIPA's website.[8]

44. Defendants' seeming endorsement of Dean Yarhi-Milo's anti-Palestinian, anti-Arab, and anti-Muslim sentiments made PWG members extremely nervous about the direction in which their campus's culture was heading and caused them to question whether, going forward, they would need to fear for their safety at SIPA.

45. Such fears proved to be well-founded. On or around October 25, 2023, a box truck displaying PWG members' full names and CampusGroups photos on massive electronic screens began circling the perimeter of Columbia University's Morningside Heights campus, where SIPA was also located. As depicted below, this doxxing truck labeled various PWG members as "Columbia's Leading Antisemites."







[7] Keren Yarhi-Milo and Tim Naftali, *The Lessons Israel Failed to Learn From the Yom Kippur War*, The Atlantic (Oct. 13, 2023), https://www.theatlantic.com/ideas/archive/2023/10/israel-yom-kippur-war-lessons-hamas/675627/.

[8] *The Lessons Israel Failed to Learn From the Yom Kippur War*, Columbia University, School of International and Public Affairs (Oct. 17, 2023), https://www.sipa.columbia.edu/news/lessons-israel-failed-learn-yom-kippur-war.

*Photo A*:
Doxxing truck on Columbia University's campus displaying PWG Member C's full name and face (redacted for privacy purposes).

*Photo B*:
Doxxing truck on Columbia University's campus displaying PWG Member I's full name and face (redacted for privacy purposes).

46. The appearance of the doxxing truck coincided with widely publicized incidents of violence targeting pro-Palestine perceived Arab and/or Muslim individuals living in the United States. For example, only a week or so prior, a six-year-old Palestinian boy was murdered and his mother severely injured in a targeted attack at their home in Plainfield Township, Illinois.

47. On or around October 25, 2023, PWG's members, terrified for their safety, met with Dean Yarhi-Milo to discuss the doxxing truck and the role Defendants had played in allowing this coordinated doxxing campaign to unfold.

48. During the October 25, 2023, meeting, PWG members raised the fact that many of the student photographs displayed on the truck were accessible only through Columbia's CampusGroups platform, which, upon information and belief, was accessible only to Columbia University community members. However, when PWG suggested that this may indicate that an individual associated with SIPA was responsible for supplying the photos used on the doxxing truck, Dean Yarhi-Milo reacted with hostility, dismissing PWG's concerns as "harmful to campus culture" and refusing to investigate the matter further.

49. On or around October 28, 2023, Defendants finally removed from CampusGroups doxxed PWG members' full names and pictures. This late action had little effect; every day for the next three weeks, the doxxing truck continued to circle the Morningside Heights campus where SIPA was located. During this time, Defendants were aware of, yet did nothing to stop, the doxxing truck from returning to campus.

50. In addition to the doxxing truck, PWG members were being targeted by a coordinated online doxxing and harassment campaign on social media and database websites

collecting and displaying their personal information. Involved with this harassment campaign were Columbia students, professors, and alumni, who worked alongside third party groups aided and abetted by Columbia affiliates.

51. For example, Victor Muslin ("Mr. Muslin"), a Columbia University alum, had been personally attending multiple of Columbia's pro-Palestine protests in order to collect information about the identities of pro-Palestine students in attendance who he perceived as being Muslim, Arab, immigrants, and/or non-citizens.

52. Mr. Muslin is a prominent figure in Canary Mission, an organization that doxxes and blacklists individuals who share pro-Palestine beliefs. He has explicitly admitted that he drafted and maintained a list of pro-Palestine, non-citizen Columbia University students whom he identified during on-campus protests for the purpose of harassing those individuals. PWG members were among those identified by Mr. Muslin.

53. As the doxxing and harassment campaign continued, several PWG members experienced severe mental anguish. One PWG member reported that as a result of the horrific, incessant doxxing she had begun "self-harm[ing] … develop[ed] suicidal tendencies, [and had] [] be[come] paranoid about [even] stepping out of the house[,]" which, in turn, caused her to miss classes and be unable to benefit from other academic opportunities.

54. Defendants' deliberate indifference to the doxxing truck and websites inflicted significant harm on PWG members, subjecting them to an unreasonably hostile environment, and interfering with the educational experiences to which they were contractually entitled.

55. PWG members' fears further escalated when, on November 25, 2023, during the Thanksgiving holiday, three 20-year-old Palestinian-American college students were shot and seriously injured in Burlington, Vermont, in an unprovoked attack occurring near the University

of Vermont. The students were attacked because they were wearing keffiyehs to show solidarity with Palestine amidst the genocide occurring in Gaza.

### C. Defendants continued to engage in and facilitate the harassment and doxxing of PWG members, culminating in ICE illegally kidnapping and detaining Mr. Khalil.

56. On November 16, 2023, Columbia University Professor Rashid Khalidi was scheduled to speak at an event organized by PWG. However, just four hours before the event was scheduled to begin, SIPA canceled the event because it allegedly posed a "security risk."

57. After PWG pushed back against the baseless cancellation, Defendants reluctantly allowed the event to proceed but required the event's organizers to: (1) allow Public Safety be heavily present throughout the event; and (2) allow Public Safety to solicit and scan the campus ID of each attendee.

58. Once again, Public Safety's presence and intense surveillance intimidated PWG members and discouraged other SIPA students from attending the event.

59. In or around November 2023, PWG posted filers advertising a screening of the film *Killing Gaza* on bulletin boards located around SIPA's campus and held open to student organizations. Shortly thereafter, other SIPA students and/or community members tore down these flyers in an effort to intimidate PWG's members and hinder attendance at the event.

60. On November 29, 2023, a PWG board member, Philip Crane, reported the *Killing Gaza* flier incident to SIPA leadership. Defendants again disregarded the report, declining to investigate or take measures to discourage such behavior.

61. Shortly thereafter, PWG posted flyers advertising another event that had been authorized by SIPA's Office of Student Affairs ("OSA") and displayed in compliance with SIPA's Bulletin Board Policy.

62. On December 7, 2023, Dean Yarhi-Milo's office tore down one of these PWG fliers, presumptively because of its animosity towards PWG's members due to their pro-Palestine viewpoints, perceived shared Arab and/or Muslim ancestry, and perceived status as non-citizens and/or immigrants. After PWG insisted that OSA provide clarification regarding the flyer's removal for several weeks, OSA confirmed that an individual from Dean Yarhi-Milo's office had removed the flyer in violation of SIPA policies. However, no remedial action was taken.

63. On January 19, 2024, a PWG member was one of multiple students sickened and hospitalized after Menachem Mendel Perez and Yuval Hadari, two students enrolled at Columbia University, sprayed the PWG member with a chemical irritant while at an on-campus, pro-Palestine rally. This incident again greatly impacted PWG members who feared they may be similarly harmed unless Defendants took action to prevent on-campus tension from escalating further.

64. In response to the attack, Defendants again failed to take any action to safeguard the safety of its students.

65. On February 19, 2024, a PWG member reported that Benjamin Kava, a student enrolled at SIPA, had torn down a PWG flyer while exclaiming, "I don't want to see this shit!" Although this incident was promptly reported to SIPA leadership, Defendants once more chose to take no action in response to the report.

66. Over the next several months, Defendants continued to foster a hostile environment on campus by: (1) publicly and privately vilifying PWG and its members to restrict the group's ability to organize and meet on campus; (2) sanctioning on-campus harassment and threats of violence against outwardly pro-Palestine students who were perceived as having shared Arab and/or Muslim ancestry, or who were perceived as immigrants and/or non-citizens, such as PWG

members; and (3) taking action that purposefully inflamed on-campus tensions.

67. Then, in furtherance of its targeted harassment towards pro-Palestine students, Columbia University formed a new, secretive disciplinary body, the Office of Institutional Equity ("OIE"), in August 2024.

68. OIE replaced the previous student disciplinary body, the University Judicial Board ("UJB"), which had consisted of both faculty members and elected student representatives. Instead, under OIE, Defendants vested decision-making authority solely in a number of investigators they had hand-picked.

69. According to OIE's website, "OIE serves as a centralized resource for addressing all reports of discrimination and discriminatory harassment, including reports that involve alleged violations of Title VI and Title VII, reports that involve alleged violations of Title IX and the University's Gender Based Misconduct Policy, as well as reports that relate to violations of the Protection of Minors Policy. OIE is responsible for reviewing, investigating, and managing all incidents from inception through resolution whether the Respondent is a student, faculty, staff member, or affiliate."[9]

70. In reality, OIE became a tool to further the institutional harassment of Mr. Khalil and PWG and its members by targeting and punishing pro-Palestine advocates and individuals associated with Palestine under the pretext of addressing discrimination.

71. After its creation, Defendants made OIE responsible for the required Title VI Training for all Columbia University faculty, staff, researchers, librarians, contractors, and student workers.

72. By the Fall 2024 semester, OIE had significantly altered previous Title VI training

[9] *See* https://institutionalequity.columbia.edu/ (last visited September 8, 2026).

to specifically target the type of pro-Palestinian speech occurring on Columbia's campus. Specifically, the revised Title VI Training utilized examples that equated any criticism of a country's military or governmental conduct with criticism based on nationality in violation of Title VI, such that any on-campus criticism of Israel's military or government conduct would now constitute a purported Title VI violation under OIE's new guidelines.

73. In effect, the Title VI Training essentially taught students that any condemnation of the Israeli government's killing of Palestinians would result in institutional harassment via investigations by OIE.

74. Alongside and in furtherance of OIE investigations, Defendants deployed a coordinated surveillance campaign against targeted students. That surveillance included hiring private investigators to monitor and question students about their pro-Palestinian affiliation and the use of campus CCTV footage and data from student ID swipes to harass, intimidate, and retaliate against students for their pro-Palestine advocacy and affiliation, their perceived shared ancestry as Arab and/or Muslim students, their national origin, and/or their status as non-citizen immigrants.

75. Defendants' development and use of OIE to retaliate against pro-Palestinian students fits within its history of creating and/or modifying institutional mechanisms in order to punish students who outwardly hold pro-Palestine views. For example, on October 23, 2023, shortly after a series of student protests led by Columbia's Students for Justice in Palestine ("SJP") and Jewish Voice for Peace ("JVP") chapters, Columbia revised its "University Event Policy" and "Student Group Event Policy and Procedure" to allow the University greater authority to "regulate the time, place, and manner of certain forms of public expression" and the exclusive authority or

"sole discretion" to impose sanctions on student organizations and their members.[10] Defendants made these revisions solely to quash pro-Palestine speech, and Columbia specifically cited these revisions when justifying the suspension of both SJP and JVP as registered student organizations at SIPA.

76. Within months of OIE's creation, Mr. Khalil, PWG's then-president, became the subject of numerous unfounded complaints, investigations, and charges of misconduct, purportedly based on false allegations of antisemitic, discriminatory, and/or disruptive conduct. PWG in its capacity as a group and other PWG members individually were likewise subjected to unfounded complaints, investigations, and charges alleging discrimination.

77. For example, in February 2025, Defendants, through OIE, brought a meritless discrimination charge against PWG and initiated disciplinary proceedings against the group. This charge related to two posts PWG had accepted as joint posts on its Instagram account, wherein the group criticized both SIPA Professor and former U.S. Ambassador to Israel, Jacob Lew, and Dean Yarhi-Milo.

78. At the same time, Defendants continued to take deliberate, intentional actions that inflamed on-campus tension and embolden individuals who continued to harass pro-Palestine students perceived as being Muslim, Arab, immigrants, and/or non-citizens.

79. For example, on March 4, 2025, SIPA invited former Prime Minister of Israel, Naftali Bennet ("Mr. Bennet"), to speak on campus. Mr. Bennet is a staunch Zionist who has previously made public comments that are extremely offensive to Muslim and Arab individuals, such as when he boasted that he has "killed lots of Arabs in [his] life and there's no problem with

[10] Huddleston, Sara, *Columbia updated its event policy webpages. Seventeen days later, it suspended SJP and JVP*, Columbia Daily Spectator (published November 17, 2023, last updated December 4, 2024), https://www.columbiaspectator.com/news/2023/11/17/columbia-updated-its-event-policy-webpages-seventeen-days-later-it-suspended-sjp-and-jvp/.

that."[11]

80. Then, on or around March 6, 2025, an assistant professor at Columbia University, Shai Davidai, ("Professor Davidai") and Columbia University student, David Lederer ("Mr. Lederer") doxxed Mr. Khalil, falsely accused him of "distributing terrorist propaganda," and called for his deportation via social media posts.




*Photo C:*
Former Columbia University Professor Shai Davidai addresses U.S. Secretary of State Marco Rubio and calls for Mr. Khalil's deportation in a post on "X" reposting Columbia University undergraduate student David Lederer's post targeting Mr. Khalil.

[11] *Naftali Bennett: I've Killed Lots of Arabs In My Life And There's No Problem With That*, HuffPost (Jul. 29, 2013), https://www.huffpost.com/entry/naftali-bennett-kill-arabs_n_3670767.

81. Upon information and belief, Defendants were aware of Professor Davidai and Mr. Lederer each having a documented history of antagonizing and harassing pro-Palestine student protesters and were immediately made aware of the social media post by Mr. Khalil and others.

82. On January 31, 2025, Mr. Khalil emailed Columbia's interim president, Katrina Armstrong ("Ms. Armstrong") and other administrators urging Columbia to take immediate action to protect international students facing severe and pervasive doxxing, discriminatory harassment, and very possibly deportation because of their pro-Palestine advocacy and affiliation, as well as their perceived shared ancestry, national origin, and/or status as non-citizen immigrants. He wrote: "*Columbia is now on notice that its students are being actively, severely, and pervasively targeted, harassed, and threatened by various doxing campaigns, some of which have a presence on its campus. Columbia must intervene to protect those international students whose ability to remain in the U.S. to complete their studies is at risk, and in some severe cases, whose lives are put at risk by these doxing campaigns.*"

83. Defendants failed to respond to Mr. Khalil's email and declined to investigate or take action against Professor Davidai or Mr. Lederer for harassing, doxxing, and smearing a fellow member of the Columbia University community.

84. On March 7, 2025, Mr. Khalil again emailed Ms. Armstrong and other SIPA administrators, reiterating his plea that Columbia to take immediate action to protect himself and other students, who were still facing severe and pervasive doxxing, and potentially deportation, because of their pro-Palestine advocacy and affiliation, as well as their perceived shared ancestry, national origin, and/or status as non-citizen, immigrants. He wrote: "*I haven't been able to sleep, fearing that ICE or a dangerous individual might come to my home. I urgently need legal support, and I urge you to intervene and provide the necessary protections to prevent further harm.*"

85. Defendants again failed to respond to Mr. Khalil's email and declined to investigate or take action.

86. One day later, as a direct result of Defendants' deliberate indifference to and enabling of months of systematic, targeted harassment and doxxing of students based on their pro-Palestine advocacy and affiliation, their perceived shared ancestry as Arab and/or Muslim students, their national origin, and/or their status as non-citizen immigrants, Mr. Khalil was illegally abducted by plainclothes ICE officers while at his Columbia-owned residential apartment building and subsequently detained for 104 days.

87. Homeland Security Department officials who directed Mr. Khalil's arrest later testified to the fact that the order to arrest Mr. Khalil came from "high-level officials at ICE" who were notified that Secretary Rubio and/or the White House had a particular interest in Mr. Khalil's detainment. One official admitted that he had never, in his 20 years as a Homeland Security employee, witnessed a lawful permanent citizen removed under similar circumstances.[12]

88. After Mr. Khalil was detained by ICE, PWG members reasonably experienced an escalation of personal terror, reasonably viewing Mr. Khalil's abduction and detention as the logical result of Defendants' deliberate indifference to the campaign of harassment and doxxing targeted toward pro-Palestine students perceived as being Muslims, Arabs, immigrants, and/or non-citizens.

89. On March 13, 2025, PWG planned an on-campus event at which students could gather and write letters to send to Mr. Khalil and his pregnant wife and share "Know Your Rights" resources to help protect each other from being similarly targeted by ICE agents. PWG provided

[12] *Am. Ass'n of Univ. Professors v. Rubio*, No. 1:25-cv-10685-WGY,(D. Mass. Mar. 25, 2025); *Senior Officials Pushed for Arrests of Student Protestors, ICE Agents Testify*, Knight First Am. Inst. At Columbia Univ. (July 15, 2025), https://knightcolumbia.org/content/senior-officials-pushed-for-arrests-of-student-protesters-ice-agents-testify.

SIPA with prior notice of this event and of an accompanying photo installation it planned to display.

90. Without reason or justification, Defendants again deployed Public Safety to surveil the individuals attending the event in an attempt to intimidate PWG members and discourage Columbia students from attending. Then, during the event, a Columbia University employee approached the installation and, without explanation, began ripping down the photographs of Mr. Khalil.

91. When PWG's members inquired into why Defendants had allowed the pictures of Mr. Khalil to be forcibly and publicly ripped down by a Columbia University staff member, they were told that the installation was an unsanctioned display and that any new materials PWG wished to post would require a dean's stamp (presumably Dean Yarhi-Milo's). PWG had not received prior notice of any such policy; and, upon information and belief, no such policy had ever been enforced against any other student group.

92. PWG members reasonably understood that they were once more being selectively subjected to Defendants' contrived policies due to their pro-Palestine viewpoints and perceived status as Arab, Muslim, non-citizen, and/or immigrant individuals.

93. Because Defendants had essentially rendered PWG unable to hold public events, PWG members began using a WhatsApp group chat (the "SIPA WhatsApp Group Chat") to voice their concerns relating to ICE having kidnapped and detained Mr. Khalil.

94. The SIPA WhatsApp Group Chat was maintained and monitored by Columbia employees and held open to all students enrolled at SIPA.

95. The concerns raised in the SIPA WhatsApp Group Chat by PWG members (*i.e.,* that they may be similarly illegally abducted and held hostage) were met with further harassment

and antagonization.

96. For example, on March 24, 2025, a PWG board member, Member E, sent a message in the SIPA WhatsApp Group Chat notifying fellow SIPA students of a planned "Informational Picket." The picket was organized to protest Mr. Khalil's ongoing detention and to inform PWG members, and students from similar backgrounds, of their rights.

97. Mr. Zubairi, now PWG's president after Mr. Khalil's detainment, urged his US-citizen peers to use their constitutional rights to protest state violence, such as the abduction, detention and deportation attempts of non-citizens. In response, another SIPA student not affiliated with PWG repeatedly accused Mr. Zubairi of being "aggressive" and advocating for "a violent process."

98. The accusation that Mr. Zubairi was aggressive and advocating for violence simply because he shared information about a peaceful picketing event fit a pattern; it was the same accusation made by Defendants when, to justify cancelling PWG's on-campus events, they characterized PWG as posing a security threat, solely based on the fact that PWG members publicly supported Palestine and were perceived as sharing Muslim and/or Arab ancestry and as being non-citizens and/or immigrants.

99. In May 2025, Defendants, through OIE, brought a second charge against PWG. This charge related to another PWG Instagram joint-post, this time displaying a video of a PWG member calling for the release of Mr. Khalil from ICE detention while at her Columbia University graduation ceremony.

100. Also in May 2025, several PWG members received the same mass OIE "Policy Reminder" stating that each student had "sent multiple alleged discriminatory and/or harassing messages in the SIPA WhatsApp chat that may have created and/or contributed to a hostile

environment" and putting the students on notice that "any future conduct may result in a Formal Investigation" under OIE Policy. Upon information and belief, only PWG members received this mass notice and the "discriminatory and/or harassing messages" were statements discussing the genocide in Gaza.

101. In order to attend the required OIE disciplinary interviews and hearings and dedicate the time required to respond to the charges brought against PWG, PWG members were forced to miss classes and shirk other educational responsibilities, thereby damaging their academic performances, ruining their ability to focus on assignments and coursework, and inflicting additional emotional distress on these individuals.

102. On July 17, 2025, OIE determined that, with respect to the February 2025 charge, the appropriate remedy would be to place PWG on probation through January 1, 2026.

103. Later that summer, a PWG member sent messages in the SIPA WhatsApp Group Chat wherein she celebrated Mr. Khalil's release from ICE detention, thanked her PWG community, and criticized Zionism. Consequently, Defendants singled out and removed this PWG member from the SIPA WhatsApp Group Chat, and SIPA's Student Association and OIE upheld her removal and denied her reentry.

104. Such actions reinforced PWG members' impressions that Defendants held immense animus towards, and therefore would not protect, pro-Palestine students perceived as being Muslims, Arabs, immigrants, and/or non-citizens.

105. On September 25, 2025, OIE determined that, with respect to the May 2025 charge, the appropriate remedy would be to suspend PWG indefinitely. OIE left open the possibility that PWG could petition for reinstatement upon taking several actions, including:

> (1) providing the full name of, and other personal information relating to, PWG's social media manager;

(2) producing a list of all members with access to PWG's Instagram account; and

(3) attending an in-person training session, despite the fact that multiple of PWG's non-citizen, Arab and/or Muslim-identifying members' feared for their physical safety while on Columbia's campus in light of ICE's presence there and Defendants refusal to protect certain of its students.

106. OIE further warned PWG that, should it fail to comply with any of these restrictions, Defendants may permanently rescind PWG's status as a recognized student organization at SIPA.

107. PWG determined that OIE's proposed remedial measures were designed to target its individual members and that comply with those measures would be unsafe for its members, many of whom had already suffered targeted harassment and doxxing and who were from marginalized groups and/or non-citizens.

108. PWG timely appealed both OIE sanctioning decisions.

109. On October 27, 2025, OIE investigators and reviewing Columbia University faculty members denied PWG's appeal in its entirety.

110. Two days later, on October 29, 2025, Dean Yarhi-Milo publicly stated that pro-Palestine and/or anti-Zionist beliefs are "a problem" on campus that need to be dealt by employing mechanisms like OIE and that she was proud of how Defendants treated pro-Palestine student protestors since October 7, 2023, including being elated with how OIE had been utilized to levy allegations against and launch investigations into students expressing pro-Palestine and/or anti-Zionist viewpoints.

111. On December 12, 2025, OIE sent a letter to PWG stating that it had been made aware that PWG was posting to its Instagram account and warning that any posting or reposting

on PWG's Instagram page was a violation of the sanctioning decision and could lead to permanent de-recognition. The sanctioning determination did not include a broad ban on any posting to PWG's Instagram account.

112. In response to PWG's request for clarification, OIE again added new conditions to the sanctioning decision, now stating that PWG must petition to "OIE for review in consultation with Student Affairs" for consideration of reinstatement, instead of directly to the Office of Student Affairs as had been previously communicated. This response added to further ambiguity in the terms of PWG's suspension and again highlighted OIE's retaliatory purpose.

113. Defendants repeatedly and publicly singling out and punishing PWG members for entirely peaceful conduct and criticisms, while failing to even investigate threats of violence being made against them, caused PWG members to reasonably fear for their safety at Columbia.

114. Defendants' failure to protect Mr. Khalil, its subsequent indifference to his detention, and its ongoing enabling of harassment against PWG members restricted PWG members' ability to attend classes and other on-campus events, thereby depriving these individuals of the educational opportunities they were contractually entitled to.

115. Defendants' recurring failure to take prompt, meaningful action in response to the doxxing and harassment of PWG's members also caused the group's members to experience serious mental anguish, as they reasonably feared being unprotected as pro-Palestine student advocates perceived as being either Muslim, Arab, non-citizens, and/or immigrants on SIPA's campus.

116. PWG has refused to comply with OIE's conditions for reinstatement because it reasonably believes that complying would essentially require PWG to doxx its own members, placing them at serious risk of harm. Upon information and belief, Defendants have not required

similarly situated, non-Muslim and/or Arab student groups to submit the names of, and/or personal information relating to, their members in order to remain active on campus.

117. PWG remains forbidden by Defendants from hosting or assisting with any official or unofficial group activities; prohibited from using Columbia's name in any of PWG's planning and/or advertising materials; and restricted from all financial assistance from Columbia.

118. Upon information and belief, because of Defendants' animus towards pro-Palestine students who they perceived as being Muslims, Arabs, non-citizens, and/or immigrants, OIE deliberately attempted to ensure PWG would be indefinitely disbanded at SIPA by purposefully moving the mark PWG had to meet to satisfy the sanctioning decisions' conditions.

119. To date, several current SIPA students have stated that they wish to join PWG and serve on its governance board but would decline to do so unless remedial measures were put in place to remedy the hostile environment PWG had operated under at SIPA prior to its suspension.

## II. Additional Allegations Relating to Individual Plaintiffs

### A. Plaintiff Mahmoud Khalil

120. Plaintiff Mahmoud Khalil repeats and realleges the allegations of the preceding paragraphs as though fully set forth herein.

121. While completing his Master's Degree program at Columbia University, Mr. Khalil worked to raise awareness about human rights in Palestine. In addition to being elected president of PWG in Spring 2023, he co-founded the Palestinian Student Union at Columbia – Dar.

122. As a representative of Palestinian students at Columbia, Mr. Khalil repeatedly met with and emailed Defendants, pleading for their support and intervention as Palestinian students, including himself, increasingly felt harassed, threatened, discriminated against, and unsafe on campus. Mr. Khalil repeatedly brought these concerns directly to Defendants and sought their assistance in protecting the Palestinian community, but Defendants failed to provide the support

or protection he sought.

123. As stated by Mr. Khalil to Columbia University's then-president Claire Shipman and other Columbia University administrators on April 8, 2024:

> Palestinians not only feel unheard but also alienated and attacked by the administration. I now rarely go to SIPA. ***What does it feel like to be a Palestinian at Columbia? It feels like I am constantly worried about my safety on campus***, fearing being called names at Low Steps, or receiving another unsubstantiated email from administration, which serves only to intimidate and threaten. Since last semester, ***I haven't gained any meaningful education at Columbia.*** I now only complete assignments to pass, not to learn, and this deeply saddens me coming from a refugee camp to Columbia to fulfill my dream of getting a first-class education, but unfortunately, it has been far from first class.

124. Because Mr. Khalil was well respected by both faculty and students during his time at SIPA, he was selected to serve as a mediator between students and Defendants regarding the Gaza Solidarity Encampment established on April 17, 2024. Assuming this role elevated Mr. Khalil to a public face of the protest movement.

125. Although Mr. Khalil was assured in writing that he would not face disciplinary action for his role as a negotiator, Defendants almost immediately began to retaliate against Mr. Khalil, levying numerous unfounded allegations of misconduct against him because of his pro-Palestine activism and his perceived identity as an Arab and Muslim individual with Palestinian identity.

126. For example, on or around April 30, 2024, Defendants abruptly suspended Mr. Khalil, determining that he posed a "security risk" purportedly due to his pro-Palestine activism. Consequently, Defendants denied Mr. Khalil access to Columbia University's campus and barred him from participating in all Columbia classes, academic activities, and extracurriculars.

127. After news of Mr. Khalil's suspension was reported and condemned, Defendants

lifted the suspension. However, Defendants refused to publicly correct factual inaccuracies surrounding its suspension; and, as a result, those false allegations were cited by the U.S. Government in its attacks against him.

128. When Mr. Khalil was allowed to return to SIPA, Defendants continued to harass and treat him with hostility due to his pro-Palestine advocacy, Muslim and Arab ancestry, Palestinian national origin, and status as a non-citizen and/or immigrant.

129. For example, between late 2024 and early 2025, Defendants, through OIE, repeatedly launched meritless allegations of antisemitism against Mr. Khalil. These allegations were premised solely on the fact that he is an Arab, Muslim, and Palestinian man was vocal against Defendants' response to Isreal's actions in Palestine.

130. For example, OIE opened an investigation into Mr. Khalil based on a message he sent in a student group stating, "*Yet SIPA's genocidal dean refuses to give Khalidi a platform at SIPA and prefers to invite warmongers.*" OIE alleged that this statement constituted harassment directed at Dean Yarhi-Milo because of her identity.

131. As a result of Defendants' numerous unfounded and retaliatory OIE allegations, Mr. Khalil was subjected to a lengthy and pervasive OIE process that caused him to postpone his job search, miss classes, and withdraw from participating in other on-campus activities and forced him to retain counsel to represent him before OIE.

132. Defendants also placed a hold and notation on Mr. Khalil's transcript prior to issuing any findings of wrongdoing. Only after a lengthy process requiring intervention of retained counsel did OIE lift the hold on Mr. Khalil's transcript.

133. As detailed above, Mr. Khalil was subjected to persistent, ongoing harassment throughout this time due to his pro-Palestine advocacy, his perceived Arab and Muslim ancestry,

and perceived status as a non-citizen and/or immigrant.

134. On February 27, 2025, Mr. Khalil submitted an OIE report notifying OIE of targeted harassment and discrimination. Upon information and belief, no action was taken by OIE to investigate and/or bring disciplinary measures to the appropriate individuals as a response.

135. On March 6, 2025, Mr. Khalil submitted to OIE multiple reports describing discrimination, doxxing, and harassment he had faced at Columbia University, including harassment by Public Safety and other university employees. Upon information and belief, no action was taken by OIE to investigate and/or bring disciplinary measures to the appropriate individuals as a response. Also included in Mr. Khalil's March 6, 2025 OIE report were screenshots of social media posts made by Professor Davidai and Mr. Lederer calling for his deportation, which he described as "*a broader pattern of targeted harassment against [him] as a Palestinian, designed to intimidate, silence, and endanger [him].*"

136. Upon information and belief, Defendants made no effort to investigate or discipline these Columbia community members' doxxing of Mr. Khalil.

137. That same day, while Mr. Khalil was on campus, Public Safety singled him out without cause and questioned why he was present there. When asked why Mr. Khalil had been approached and questioned about how he had gained access to campus, Public Safety was unable to provide any explanation. Nonetheless, videos of the interaction subsequently circulated online and were used by Columbia affiliates to smear Mr. Khalil, including by calling for his arrest and deportation. Mr. Khalil reasonably interpreted this action as an attempt to target and/or intimidate him because of his identity as a Palestinian, Arab, and Muslim individual.

138. Mr. Khalil reported the incident where he was singled and out and discriminated against to OIE and other Columbia University officials, alongside a fellow PWG member who

witnessed the event. Upon information and belief, in violation of Defendants' own policies and procedures, OIE took no disciplinary action against the perpetrator, and Defendants failed to clarify or correct the erroneous public reporting of this incident.

139. As detailed above, on March 8, 2025, plain clothed ICE officers unlawfully entered the vestibule of Mr. Khalil's university apartment building and abducted him without a warrant in front of his then-pregnant wife. He was transported to immigration detention in Jena, Louisiana within hours, nearly 1,300 miles from family and counsel.

140. Defendants again refused to accurately report the circumstances of this event and or clarify incorrect reporting regarding the nature of Mr. Khalil's role as a negotiator and mediator during the protests, allowing the false narrative about his conduct and role to persist.

141. Defendants' response to Mr. Khalil's unlawful detainment and abduction was notably different from how it handled a Spring 2026 incident, during which ICE had similarly entered Columbia University's campus and impermissibly arrested an international student not affiliated with Palestinian advocacy.[13] In that incident, Defendants provided the detained student legal support and pledged to deploy additional Public Safety officers to residential buildings to deter ICE detainments.

142. Mr. Khalil was released from ICE detention on bail on June 20, 2025.

143. During the Fall 2025 semester, Mr. Khalil requested a guest pass to visit Columbia University's campus in part to return a library book. Although guest passes are routinely granted to alumni like Mr. Khalil seeking to visit the University's campus. Defendants rejected Mr.

---

[13] Nadia Knoblauch and Dora Gao, *ICE arrests Columbia student, Shipman says agents lied to enter University-owned residence*, Columbia Daily Spectator, (Feb. 26, 2026), https://www.columbiaspectator.com/news/2026/02/26/dhs-agents-detain-columbia-student-after-entering-university-owned-residence-shipman-reports/("[University President] Shipman wrote in her email that the University is providing legal support to the student, marking the first time a University president has explicitly acknowledged providing legal support to a student detained by DHA in a University-wide email.")

Khalil's request without providing any legitimate justification. Defendants have since blocked his library account for an outstanding fee of $100.

144. Also during the Fall 2025 semester, a group of Columbia University professors sought to have Mr. Khalil speak to their classes. Defendants threatened the professors and stated that allowing Mr. Khalil to speak to their classes posed a risk of creating a "hostile environment."

145. Also during the Fall 2025 semester, a group of Columbia professors sought to have Mr. Khalil speak at a screening of *The Encampments*, in which Mr. Khalil is one of the film's protagonists. Defendants again refused to permit Mr. Khalil to enter campus to attend the event, without providing any legitimate justification for their decision.

146. Time and again, Mr. Khalil, a Columbia University tuition-paying student, turned to Defendants to uphold their end of their educational contract to no avail. Mr. Khalil was legally entitled to a learning environment free from harassment and hostility based on his Palestinian, Muslim, and Arab ancestry and status as a non-citizen immigrant. Defendants stripped him of these rights.

147. Defendants – due to both their animus towards pro-Palestine, perceived Arab, Muslim, and immigrant and/or non-citizen individuals and their frustration with Mr. Khalil repeatedly reporting national origin, ancestry, and religion-based harassment he had been subjected to at SIPA, as was his right under Title VI – retaliated against Mr. Khalil by deliberately failing to investigate the aforementioned instances of doxxing and harassment instigated by a fellow Columbia University professor and student. Such actions cost Mr. Khalil his freedom and, consequently, his educational benefit.

148. Defendants continue to deny Mr. Khalil benefits he is entitled as a Columbia alum; including, but not limited to, barring him from Columbia's campus.

149. Defendants' retaliation against Mr. Khalil and the hostile environment they deliberately cultivated on SIPA's campus negatively impacted Mr. Khalil's wellbeing, including by causing him to develop severe anxiety, hypervigilance, insomnia, and an intense and ongoing fear for his safety.

**B. Plaintiff Mohammad Ibrahim Zubairi**

150. Plaintiff Mohammad Ibrahim Zubairi repeats and realleges the allegations of the preceding paragraphs as though fully set forth herein.

151. Mr. Zubairi is a Muslim man who was enrolled as a student at SIPA from August 2024 to May of 2026. He became president of PWG shortly after Mr. Khalil's detention and continued to serve in that role through PWG's suspension and to the present.

152. As president of PWG, Mr. Zubairi became one of the most visible pro-Palestine student advocates at SIPA, making him a target for harassment due to his pro-Palestine advocacy and affiliation, his perceived shared ancestry as an Arab and/or Muslim student, his national origin, and/or his status as non-citizen immigrants.

153. For example, at a student group officer training event, Dean Yarhi-Milo asked Mr. Zubairi which part of Palestine he is from and seemed surprised and confused—even repelled—by his choice to affiliate himself with Palestine when he himself is not Palestinian.

154. As discussed above, on March 24, 2025, a PWG member (identified below as PWG Member E) sent a message in the SIPA WhatsApp Group Chat wherein she notified fellow SIPA students of an Informational Picket that PWG had organized to protest Mr. Khalil's ongoing detention and inform similarly at-risk individuals of their rights. In response to this message relating to the informational picket, a non-PWG affiliated SIPA student repeatedly accused Mr. Zubairi of being aggressive and sent a message in SIPA WhatsApp Group Chat stating, "As a

longtime resident of this city and lifelong citizen of this country, please check your violence at the door."

155. Given that ICE had recently illegally detained and kidnapped PWG's former president, Mr. Zubairi, as a non-citizen and PWG's then-president, felt threatened by this fellow SIPA student emphasizing his immigration status while baselessly but publicly accusing him of being an aggressive and violent person.

156. In the aftermath of this and several other hostile incidents with SIPA affiliates, Mr. Zubairi altered the course of his SIPA education to avoid the hostile environment described herein, opting for electives outside of SIPA so as to minimize interactions with SIPA faculty, SIPA OSA staff and the wider SIPA cohort as he had been harassed for advocating on behalf of his Palestinian friend and colleague.

157. Likewise, in Spring 2026, Mr. Zubairi requested an exemption from the international travel component of his Capstone Project out of fear for his physical safety and immigration status, The Capstone Project is an integral part of the SIPA curriculum and a benefit to which his tuition entitled him.

158. In addition to the significant toll on his educational benefits, Mr. Zubairi suffers from Generalized Anxiety Disorder and Panic Disorder and has experienced acute episodes of anxiety and panic attacks, even requiring medication as a result of the hostile treatment he experienced at SIPA because of his pro-Palestine advocacy and affiliation and his perceived ancestry, national origin, and non-citizen immigrant status.

## III. Additional Allegations Relating to Non-Party PWG Members

### A. PWG Member A: Tariq Kenney-Shawa

159. Tariq Kenney-Shawa, PWG Member A, is a Palestinian-American man.

160. Mr. Kenney-Shawa was a student at Columbia University between Fall 2020 and May 2022. He joined PWG in September 2020 and later served as a PWG board member.

161. In March 2022, while a PWG board member, Mr. Kenney-Shawa published Instagram stories relating to his experience during PalTrek. Another SIPA student reported Mr. Kenney-Shawa's Instagram activity to a SIPA professor, alleging that Mr. Kenney-Shawa's description of his own experience constituted bullying.

162. On March 31, 2022, Defendants compelled Mr. Kenney-Shawa to meet regarding the complaint. Defendants did not disclose or otherwise provide Mr. Kenney-Shawa with notice of the meeting's specific purpose. Upon learning about the substance of the complaint, Mr. Kenney-Shawa expressed concern that he was being intentionally singled out as a Palestinian student and noted that several other students had similarly posted about their experiences while attending iTrek and PalTrek without issue.

163. As a result of Defendants' meritless investigation, Mr. Kenney-Shawa withdrew from on-campus activities due to fear that he would be unjustly punished for misconduct that he did not commit. Defendants' actions caused Mr. Kenney-Shawa to feel excluded at SIPA because of his Palestinian identity and deprived him of the full benefit of his educational experience.

164. In April 2022, Mr. Kenney-Shawa observed a first-year PWG member who had participated in PalTrek being verbally harassed by a SIPA student for wearing a traditional Palestinian *keffiyeh*, explicitly calling the *keffiyeh* "what terrorists wear."

165. Around this same time, Mr. Kenney-Shawa also witnessed a Jewish SIPA student verbally harasses a different PWG member, making an inflammatory and baseless blanket statement that Palestinians would "shoot her if she [told] them she's Jewish."

166. Mr. Kenney-Shawa personally reported these incidents of harassment to SIPA's

Office of Student Affairs. A complaint was also lodged with Columbia's Ombuds Office, which aims to "promote civility, mutual respect and ethical conduct, and to identify ways to prevent disruptive conflict by alerting the administration to policy issues[.]"[14] Upon information and belief, in violation of their own policies and procedures, no further action was taken by Defendants.

167. Together, these experiences, and Defendants' deliberate inaction, left Mr. Kenney-Shawa with the sense that his Palestinian identity and advocacy for the human rights of his own people were and would continue to be uniquely stigmatized, unwelcomed and inadequately protected at SIPA.

**B. PWG Member B: Jasmine Dakhil Sarryeh-Jemersic**

168. Ms. Jasmine Sarryeh-Jemersic, PWG Member B, is a Palestinian woman.

169. Between 2019 and 2026, Ms. Jasmine Sarryeh-Jemersic was a Columbia University student. Beginning in January 2023, Ms. Sarryeh-Jemersic served as a PWG board member.

170. Following October 7, 2023, Ms. Sarryeh-Jemersic, in her capacity as a PWG board member, sent multiple emails to Dean Yarhi-Milo asking that she meet with her and other Palestinian students, including other PWG members, to discuss Defendants' response to the recent escalation in perceived national origin, ancestry, and citizenship-based harassment that had been taking place at SIPA. Neither Dean Yarhi-Milo nor any other member of SIPA leadership responded to these requests.

171. On October 18, 2023, Ms. Sarryeh-Jemersic was doxxed by Canary Mission via the publishing of a website listing Ms. Sarryeh-Jemersic's full name, photograph, and former employers, and including links to her social media pages. The doxxing website remains active.

172. Ms. Sarryeh-Jemersic immediately reported, via email, the creation of the doxxing

[14] *About the Ombuds*, Columbia, Ombuds Office, https://ombuds.columbia.edu/ (last visited September 11, 2026).

website to Defendants, explaining that these circumstances made her fear for her physical safety both on and off SIPA's campus. Because of her safety concerns, Ms. Sarryeh-Jemersic experienced serious emotional distress and was nervous to attend classes. Nonetheless, Defendants failed to take any action in response to Ms. Sarryeh-Jemersic's report.

173. On November 30, 2023, Columbia University hosted a public conversation between Dean Yarhi-Milo and the dean of Princeton University's School of Public and International Affairs, Amaney Jamal. During this event, Ms. Sarryeh-Jemersic asked Dean Yarhi-Milo about why she had declined to respond to her emails. In response, Dean Yarhi-Milo began yelling at Ms. Sarryeh-Jemersic in front of other SIPA students and faculty.

174. Eventually, Dean Yarhi-Milo met with Ms. Sarryeh-Jemersic to discuss the doxxing of PWG members, including herself, that had been taking place at Columbia. During this meeting, Ms. Sarryeh-Jemersic raised the question of whether a SIPA affiliate had leaked the photos displayed on the doxxing truck that had been circling Columbia's campus. Rather than acknowledging the seriousness of Ms. Sarryeh-Jemersic concerns, Dean Yarhi-Milo angrily dismissed Ms. Sarryeh-Jemersic's concerns as harmful to campus culture and declined to investigate who had accessed PWG's CampusGroups page.

175. When Ms. Sarryeh-Jemersic subsequently asked Dean Yarhi-Milo whether SIPA leadership had even attempted to investigate how PWG members' photos, which were the same as those used on the password-protected CampusGroups platform, had been leaked to the doxxing truck, Dean Yarhi-Milo grew incredibly confrontational, exclaiming, "How dare you, imply someone from the school would be associated with this!"

176. Again, Dean Yarhi-Milo refused to investigate how PWG members' photos were leaked from CampusGroups, intentionally disregarding the valid safety concerns raised by PWG

members, including, but not limited to Ms. Sarryeh-Jemersic, because of her animus towards pro-Palestine individuals who she perceived as being Arabs, Muslims, and non-citizens and/or immigrants.

177. Because Ms. Sarryeh-Jemersic had been doxxed and left unprotected by Defendants, who refused to investigate the incident and even publicly antagonized and vilified her, Ms. Sarryeh-Jemersic experienced extreme emotional distress, struggling to attend classes and to complete her coursework. Thus, both Defendants' affirmative actions and their intentional failure to act deprived Ms. Sarryeh-Jemersic of the full benefit of her education at Columbia.

**C. PWG Member C: Bhavana Bellamkonda**

178. Between August 2022 and May 2024, Ms. Bellamkonda, PWG Member C, was a Columbia University student. Ms. Bellamkonda became a PWG member in January 2023.

179. Ms. Bellamkonda was one of the PWG members who, beginning in October 2023, had her full name and CampusGroups photograph displayed on the doxxing truck next to the words "Columbia's Leading Antisemites."

180. Around the same time the doxxing truck appeared, Ms. Bellamkonda was doxxed online by Accuracy in Media ("AIM"), a right-wing nonprofit group and the same organization responsible for the doxxing trucks. AIM purchased the domain of a website matching Ms. Bellamkonda's full name and published Ms. Bellamkonda's full name, photograph, and details about the school she attended. The doxxing website remains active.

181. Ms. Bellamkonda immediately reported both her information appearing on the doxxing truck and the publishing of the doxxing website to Defendants.

182. Defendants failed to take any meaningful action to investigate or otherwise address the serious safety issues posed by the doxxing truck or the doxxing website and were deliberately

indifferent to the severe trauma these incidents caused Ms. Bellamkonda.

183. During the Spring 2024 semester, Ms. Bellamkonda enrolled in a SIPA course titled "Terrorism and Counter Terrorism." When attending this class, Ms. Bellamkonda regularly wore a keffiyeh as a show of solidarity with the Palestinian people.

184. On February 19, 2024, during the Terrorism and Counter Terrorism course, a non-Muslim and/or Arab student enrolled in the same class, Sarah Cohen, referred to Ms. Bellamkonda as "our resident terrorist" and insinuated that Ms. Bellamkonda had enrolled in the class to provide an "expert opinion" on terrorism — a statement clearly made in direct reference to Ms. Bellamkonda's pro-Palestinian advocacy and her being perceived Muslim and/or Arab.

185. On February 20, 2024, Ms. Bellamkonda reported this remark to the Center for Student Success and Intervention ("CSSI"). CSSI took approximately two months to initially follow up on the report. Then, on June 18, 2024, Ms. Bellamkonda unexpectedly received a notice from CSSI that her report had been resolved.

186. Upon information and belief, Defendants did not discipline or reprimand Ms. Cohen for her comments. Instead, Defendants rewarded Ms. Cohen by appointing her as a scholar and speechwriter to the distinguished SIPA IGP, which was co-led by Dean Yarhi-Milo.

187. As a result of these incidents and Defendants' deliberate indifference to the severity of the doxxing harassment Ms. Cohen was subjected to, Ms. Bellamkonda suffered severe emotional distress that made it difficult for her to attend classes, depriving her of the full benefit of her education.

**D. PWG Member D: Tasfia Arshad**

188. Ms. Arshad was a Columbia University student from Fall 2022 to Spring 2024. She is a Muslim woman and became a PWG member during the Spring 2023 semester.

189. Ms. Arshad was doxxed online by AIM, who purchased the domain of a website matching her full name and on which Ms. Arshad's name, photograph, and details about the school she attended were published. The doxxing website remains active.

190. Ms. Arshad immediately reported the doxxing website to Defendants, explaining how these circumstances understandably made her fear for her physical safety both on and off SIPA's campus, thereby causing her serious emotional distress and making her nervous to attend classes.

191. Defendants failed to take any meaningful action to investigate or otherwise address the serious safety issues posed by the doxxing website and remained deliberately indifferent to the severe trauma these incidents caused Ms. Arshad.

192. Following this incident, Ms. Arshad no longer felt safe at SIPA. She had her partner or sister pick her up any time she attended classes at SIPA because she believed that, were she spotted leaving alone, she was likely to be followed and subsequently harmed. Ms. Arshad's legitimate concerns and anxiety caused her to experience trouble sleeping, rendered her unable to travel alone due to fear and anxiety, and caused her to experience overwhelm and crying spells, particularly while on SIPA's campus.

193. Due to these issues and Defendants' failure to take action to protect Ms. Arshad, she stopped attending classes at SIPA in Spring 2024.

**E. PWG Member E: Anonymous**

194. Between August 2023 through May 2025, PWG Member E was a Columbia University student. PWG Member E joined PWG during the Spring 2024 semester.

195. Member E is currently expelled from Columbia University in relation to her Pro-Palestine advocacy and affiliation.

196. Following Mr. Khalil's detainment, Member E placed pro-Palestine stickers, including ones that simply read "Free Mahmoud," around SIPA's campus.

197. In April 2025, while Member E was in Louisiana supporting Mr. Khalil at one of his immigration hearings, CSSI contacted Member E alleging that she had violated University policy by "placing stickers in numerous locations within SIPA without authorization."

198. On April 13, 2025, Member E reached out to CSSI requesting an extension for her disciplinary hearing for medical purposes. Specifically, Member E was experiencing severe anxiety and trauma due to Mr. Khalil's detainment. CSSI denied Member E's request without further explanation.

199. During the hearing, CSSI provoked Member E, causing her to suffer an emotional breakdown and leave in tears.

200. Upon information and belief, non-Muslim and/or Arab students frequently posted non-authorized stickers around SIPA's campus with no consequence, and Defendants' selective enforcement against Member E was intended to retaliate against her on the basis of her pro-Palestinian advocacy in addition to her perceived ancestry, national origin, and assumed non-citizen and/or immigrant status.

201. Additionally, Member E received an OIE charge for an incident during which she lawfully recorded Dean Yarhi-Milo while questioning why she decided to invite and host Mr. Bennett in the midst of the student protests against Israel. Member E expressed that this decision was an explicit choice by Defendants to contribute to a hostile and discriminatory environment on campus and to exacerbate the harms caused onto Plaintiffs and the sentiment that Palestinians and PWG were unwelcome at SIPA.

202. On June 16, 2025, Member E was found to have violated OIE policy and sanctioned

with a one-year academic suspension. The June 16, 2025 sanctioning letter stated, "It was … alleged that you targeted Individual #1 on the basis of the individual's actual or perceived membership in, or associated with a Protected Class." Individual #1 referred to Dean Yarhi-Milo.

203. The OIE disciplinary measures brought against Member E again demonstrate how Defendants have weaponized OIE against PWG members due to their association with Palestine, pro-Palestine advocacy and affiliation, as well as their perceived shared ancestry, national origin, and/or immigrant status.

204. On July 2, 2025, Member E was again subjected to a meritless OIE allegation of discrimination for sending pro-Palestine and anti-Zionist messages in the SIPA WhatsApp Group Chat on June 20, 2025, the day of Mr. Khalil's release from ICE detention.

205. On February 18, 2026, Defendants concluded their OIE investigation and expelled PWG Member E for her June 20, 2025 WhatsApp Group Chat messages.

206. As a result of Defendants' targeted retaliation against Member E, she has suffered severe, debilitating panic attacks and other ongoing emotional distress.

**F. PWG Member F: Anonymous**

207. PWG Member F was a Columbia University student between Fall 2022 and May 2024. She joined PWG in 2023.

208. Beginning in October 2023, Member F's full name and CampusGroups photograph were displayed on the doxxing truck next to the words "Columbia's Leading Antisemites." The photograph displayed on the doxxing truck was one only known to be uploaded to the CampusGroups directory.

209. Member F immediately reported the doxxing truck to Defendants, explaining how the truck understandably made her fearful for her safety both on and off SIPA's campus, thereby

causing her serious emotional distress and making her nervous to attend classes.

210. Defendants failed to take any meaningful action to investigate or otherwise address the serious safety issues posed by the doxxing truck and were deliberately indifferent to the severe trauma these incidents caused Member F.

211. Additionally, Member F was present and involved with PWG organizing during multiple instances where OSA canceled a PWG event at the last minute or created unnecessary hurtles to approve an event, contributing to her feeling unwelcomed at SIPA for her association with Palestine and resulting perceived shared ancestry.

**G. PWG Member G: Carly Shaffer**

212. Ms. Shaffer was a Columbia University student between Fall 2023 and May 2025.

213. Ms. Shaffer joined PWG during the Spring 2024 semester and served as the PWG representative during the OIE proceedings for the allegations brought against PWG.

214. As a result of her affiliation with Palestinians, her leadership with PWG, and advocacy for Mr. Khalil and pro-Palestine causes, Ms. Shaffer suffered significant harassment from other Columbia students and faculty, including her exclusion from SIPA Jewish student group chats, interrogation by multiple professors, harassment in Columbia Senate meetings, and unconsented recording in class.

215. As a result of her involvement with PWG and advocacy for Mr. Khalil and pro-Palestine causes, Ms. Shaffer missed classes and a midterm exam because of the hostile educational environment at Columbia and its effect on her.

216. As a result of harassment, the pervasive hostile environment she endured at SIPA, and Defendants' deliberate indifference to those events, Ms. Shaffer suffered from anxiety and endured related nightmares to such severity that she was eventually hospitalized.

**H. PWG Member H: Danial Saiyid**

217. Mr. Saiyid was a Columbia University student between January 2023 and December 2023. Mr. Saiyid is a Muslim man and has been a member of PWG since January 2023.

218. In October 2023, Mr. Saiyid was doxxed online by AIM, who purchased the domain of a website matching his full name and, on this website, published his name and the name of the school he attended. The doxxing website remains active.

219. Unlike other PWG Members, Mr. Saiyid's photograph did not appear alongside his name on doxxing website, ostensibly because he did not have a photograph of himself uploaded to CampusGroups.

220. Mr. Saiyid immediately reported the doxxing website to Defendants, explaining how these circumstances understandably made him fearful for his safety both on and off SIPA's campus, thereby causing him serious emotional distress and making him nervous to attend classes.

221. Defendants failed to take any meaningful action to investigate or otherwise address the serious safety issues posed by the doxxing website and were deliberately indifferent to the severe trauma these incidents caused Mr. Saiyid.

222. Defendants' failure to act, and the harassment of perceived Muslim and/or Arab individuals that pursued, caused Mr. Saiyid to fear for his physical safety and future job prospects. The harassment distracted him from his classes and kept him from enjoying the full benefit of his educational experience.

**I. PWG Member I: Anonymous**

223. PWG Member I was a Columbia University student between September 2022 through May 2024. Member I joined PWG in January 2023.

224. In October 2023, Member I was doxxed online by AIM, who purchased the domain

of a website matching her full name and, on this website, published his name, photograph, and the name of the school she attended. The doxxing website remains active and, because of its domain name, appears whenever Member I's name is entered into a search engine, such as Google.

225. Member I immediately reported the doxxing website to Defendants, explaining how these circumstances understandably made her fearful for her safety both on and off SIPA's campus, thereby causing her serious emotional distress and making her nervous to attend classes.

226. Defendants failed to take any meaningful action to investigate or otherwise address the serious safety issues posed by the doxxing website and was deliberately indifferent to the severe trauma these incidents caused Member I.

**J. PWG Member J: Miriam Yousaf**

227. Ms. Yousaf is a Pakistani-American and Muslim woman who was a student at Columbia and SIPA from September 2024 through May 2026. Ms. Yousaf joined PWG in October 2024 and has served on the board since June 2025.

228. On November 5, 2025, Ms. Yousaf tried to register Mr. Khalil as a guest for entry to campus. Ms. Yousaf filled out the form stating accurate timing, contact information, and purpose of visit. Upon submission, she received an error message reading, "Your request could not be completed. Please contact Public Safety."

229. Ms. Yousaf's request to register Mr. Khalil as a guest was denied in retaliation for her and Mr. Khalil's pro-Palestine advocacy, perceived shared Arab and/or Muslim ancestry, and perceived immigrant and non-citizen status.

230. Ms. Yousaf has felt targeted and fearful for her safety at SIPA as a result of her affiliation with Palestine and ethnicity. The hostile environment that Defendants facilitated caused Ms. Yousaf such intense mental anguish that it was difficult to focus on her coursework, depriving

her of the ability to enjoy the full benefit of her education at Columbia.

**K. PWG Member K: Phillip Crane**

231. Mr. Crane was a student at Columbia and SIPA from August 2022 through May 2024. Mr. Crane joined PWG in Fall 2022 and, at times, served as its secretary.

232. Mr. Crane was doxxed on a website created by AIM. The website is still active and features a pre-filled email form to send to leaders to Mr. Crane's current place of employment, Virginia Military Institute, to call for his termination.

233. Mr. Crane's full name and photograph also appeared on the doxxing truck. The doxxing truck displayed a link to a website with the same pre-filled email to Virginia Military Institute, Mr. Crane's current employer.

234. Mr. Crane immediately reported both the doxxing truck and the doxxing website to Defendants.

235. Defendants failed to take any meaningful action to investigate or otherwise address the serious safety issues posed by the doxxing truck or the doxxing website and were deliberately indifferent to the severe trauma and threat to future employment these incidents caused Mr. Crane.

**L. PWG Member L: Anonymous**

236. Member L was a student at SIPA and Columbia from Fall 2022 through May 2025. Member L has been a member of PWG since Fall 2022 and at times served as co-president.

237. As a result of her PWG membership and visible pro-Palestine advocacy and affiliation, Member L was often perceived as Palestinian.

238. Member L experienced multiple instances of harassment and exclusion from campus activities as a result of her membership with PWG and perceived Palestinian ancestry as described above, including an altercation between Dean Yarhi-Milo and two other PWG members

and retaliation against PWG members following Mr. Khalil's detainment.

239. As a result of Defendants' deliberate indifference towards the on-campus harassment of and retaliation against PWG members, Member L suffered anxiety that interfered with her ability to attend class and led her to attend classes virtually.

**M. PWG Member M: Lucas Brooks**

240. Mr. Brooks was a student at SIPA from Fall 2023 through Spring 2025. He joined PWG in Fall 2023 and served on the board in Spring 2025.

241. Mr. Brooks served alongside Ms. Shaffer as the PWG representative for OIE disciplinary proceedings with OIE.

242. Mr. Brooks reported Public Safety's March 6, 2025 harassment of Mr. Khalil to OIE on March 24, 2025.

243. Defendants failed to respond to Mr. Brooks or otherwise investigate his allegations.

244. As a result of Defendants' deliberate indifference towards the on-campus harassment of and retaliation against PWG members, Mr. Brooks was denied the full benefit of his education, including but not limited to, his inability to focus on his coursework or participate in PWG's advocacy efforts.

## CAUSES OF ACTION

### COUNT I
### Violations of Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d.

245. Plaintiffs repeat and reallege the allegations of the preceding paragraphs as though fully set forth herein.

246. Title VI provides that "[n]o person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance."

42 U.S.C. § 2000d.

247. Defendants receive financial assistance from the United States Department of Education and are therefore subject to suit under Title VI of the Civil Rights Act of 1964.

248. The U.S. Department of education defines the types of discrimination prohibited under Title VI as including harassment based on a student's actual or perceived shared ancestry or ethnic characteristics, or citizenship or residency in a country with a dominant religion or distinct religious identity.

249. As alleged herein, Defendants fostered an environment in which the continued harassment of Plaintiffs – both in their capacity as PWG members, and as individual students – based on their perceived shared ancestry as Arab and/or Muslim and/or Palestinian individuals and/or for their association or affiliation with a protected class was, at the very least, regularly tolerated and passively accepted, if not actively encouraged.

250. Plaintiffs reported each instance of harassment to Defendants through the appropriate channels. Plaintiffs' complaints were never adequately investigated, nor did Defendants discipline the individuals responsible for the harassment.

251. The ongoing harassment of Plaintiffs, and Defendants' lack of response, has and continues to cause Plaintiffs to miss classes and exams, suffer extreme mental health crises, and fear for their physical safety. As a result, Plaintiffs have not been able to, and still cannot, participate in and benefit from the full extent of their education at Columbia University.

252. Furthermore, Defendants themselves routinely harassed and encumbered Plaintiffs – both in their capacity as PWG members, and as individual students – because of their perceived shared ancestry and pro-Palestine viewpoints when publicly accusing Plaintiffs of being violent, despite having not legitimate basis for doing so, and arbitrarily limiting their ability to meet on-

campus and organize events.

253. The hostile environment which Defendants have fostered remains on Columbia University's campus as evidenced by the most recent sighting of the doxxing truck on March 2, 2026.

254. Plaintiffs have been and will continue to be injured because Defendants have and will continue to deny equal access to the educational opportunities and benefits provided to other students and alumni as a result of the hostile environment towards students perceived as having shared Muslim and/or Arab ancestry at SIPA.

255. As a result of the foregoing, Plaintiffs Mr. Khalil, Mr. Zubairi, and PWG and its members have suffered, and continue to suffer, substantial damages, in amounts to be determined at trial.

256. Defendants' violations of Title VI are the actual, direct, and proximate causes of Mr. Khalil's, Mr. Zubairi's, and PWG and its members' injuries.

257. As such, Plaintiffs are entitled to appropriate injunctive relief under Title VI because Defendants have knowledge of, contributed to creating, and continue to be deliberately indifferent to, a hostile educational environment that is severe, persistent, and pervasive; there is no adequate or speedy remedy at law to prevent Defendants from continuing to discriminate against students on the basis of their perceived shared Muslim and/or Arab ancestry, and the harm Plaintiffs will otherwise continue to suffer is irreparable.

258. Plaintiffs are also entitled to attorneys' fees and costs pursuant to 42 U.S.C. § 1988.

**COUNT II**
**Violations of Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d.**

259. Plaintiffs repeat and reallege the allegations of the preceding paragraphs as though fully set forth herein.

260. As explained by the U.S. Department of Education, Title VI additionally prohibits an institution receiving federal funding from retaliating against individuals, such as students who, pursuant to Title VI, attempt to "exercise their civil rights, oppose discrimination, [or] report discrimination[.]"

261. As set forth above, under Title VI, the term "discrimination" is interpreted as including harassment "based on a student's actual or perceived[] shared ancestry or ethnic characteristics, or citizenship or residency in a country with a dominant religion or distinct religious identity."

262. As such, Defendants, as recipients of federal funds, are subject to liability under Title VI to the extent they retaliated against Plaintiffs – both as members of PWG and in their individual capacities – for engaging in protected activities, such as advocating against and reporting harassment Plaintiffs were subjected to because of their national origins and/or perceived shared ancestry.

263. As described herein, throughout the relevant time period, Plaintiffs, individually and in their capacity as PWG members, engaged in protected activity. For example, Plaintiffs:

> (a) filed reports with SIPA's Student Affairs Office and OIE relating to the on-campus harassment of PWG members;
>
> (b) met with SIPA's administrators to report and oppose the harassment they were being forced to endure;
>
> (c) publicized, through social media and public statements, the hostility they had been subjected to on SIPA's campus;
>
> (d) criticized, through PWG's Instagram account, the discriminatory public conduct of SIPA officials, including, but not limited to, Dean Yarhi-Milo and Professor Jacob Lew; and
>
> (e) raised Title VI concerns directly with the OIE during disciplinary proceedings.

264. Plaintiffs' protected actions were the motivation for Defendants' retaliation against them, both as individuals and in their capacity as PWG members.

265. Specifically, Defendants retaliated against Plaintiffs by subjecting them to materially adverse actions including, but not limited to,

> (a) initiating disciplinary proceedings against PGW in February 2025 in retaliation for PWG's intensified public advocacy regarding Mr. Khalil's detention;
>
> (b) on May 5, 2025 sending mass warning letters to PWG's board members in retaliation for PWG members' pro-Palestine advocacy in the SIPA WhatsApp Group chat;
>
> (c) issuing sanctions against PWG, pursuant to which PWG was required to disclose multiple of its members' identities and personal information, in July 2025;
>
> (d) indefinitely suspending PWG as a recognized student organization at SIPA in September 2025;
>
> (e) expanding the scope of PWG's indefinite expulsion to prohibit any Instagram activity in December 2025;
>
> (e) expelling a PWG member from SIPA in February 2026;
>
> (f) repeatedly refusing to investigate complaints of harassment and/or doxxing made by various individual PWG members; and
>
> (g) excluding Mr. Khalil from campus and from academic participation.

266. The temporal proximity between the aforementioned events and the protected activity described herein makes clear Defendants acted with retaliatory intent in violation of Title VI.

**COUNT III**
**<u>Violations of N.Y. Exec. Law § 296</u>**

267. Plaintiffs repeat and reallege the allegations of the preceding paragraphs as though fully set forth herein.

268. New York Executive Law § 296(4) forbids an educational institution from "permit[ting] the harassment of any student ... by reason of his race, color, religion, disability, national origin, citizenship or immigration status[.]"

269. Defendants constitute an educational institution for purposes of N.Y. Exec. Law § 296(4).

270. As alleged herein, Defendants fostered an environment in which the continued harassment of Plaintiffs – both in their capacity as PWG members, and as individual students – was, at the very least, regularly tolerated and passively accepted, if not actively encouraged. This harassment was based on Plaintiffs' perceived and/or actual identities as: (1) Muslim individuals; (2) individuals of Arab origins; (3) Palestinians; and (4) non-citizens and/or immigrants.

271. As also alleged herein, Defendants themselves also harassed Plaintiffs – both in their capacity as PWG members, and as individual students – because of Plaintiffs' perceived and/or actual identities as: (1) Muslim individuals; (2) individuals of Arab origins; (3) Palestinians; and (4) non-citizen immigrants.

272. As such, Plaintiffs are also entitled to injunctive relief under New York Executive Law § 296; the harm that Plaintiffs have been, and will otherwise continue to be, subjected to is irreparable.

273. Additionally, Plaintiffs are entitled to attorneys' fees and costs pursuant to N.Y. Exec. Law § 297(10).

**COUNT IV**
<u>**Violations of New York City Admin. Code § 8-107(4)**</u>

274. Plaintiffs restate the foregoing paragraphs as is set forth fully herein.

275. New York City Admin. Code § 8-107(4) prohibits places of public accommodation from subjecting individuals and organizations to discrimination or harassment – including based

on actual or perceived race, creed, national origin, immigration or citizenship status.

276. Columbia constitutes a public accommodation because, in Defendants' own words, "Columbia has an open campus" which non-students are permitted to access "at [their] leisure[.]"[15] Defendants' reinforced this stance as recently as September 7, 2026, when announcing that is was "expanding campus guest access" because "[o]penness, exchange, and engagement, with one another, with our neighbors, and with the wider world, are [] fundamental to who [Columbia] [is] as an institution and to [Columbia's] academic mission."[16]

277. The acts and omissions of Columbia and its administrators and other employees have subjected, and continue to subject, Plaintiffs to discrimination and harassment on the basis of their race and national origin, as well as citizenship status, that is severe and pervasive.

**COUNT V**
**Breach of Contract**

278. Plaintiffs repeat and reallege the allegations of the preceding paragraphs as though fully set forth herein.

279. Columbia University's Rules of University Conduct provide that "[t]he University has an obligation to assure members of its community that they can continue in their academic pursuits without fear for their personal security or other serious intrusions on their ability to teach and to study."

280. Columbia University's Non-Discrimination Statement and Policy additionally prohibits discrimination against any person on the basis of citizenship status, creed, national origin,

---

[15] *See Frequently Asked Questions,* Columbia University, Visitors Center https://visit.columbia.edu/content/frequently-asked-questions (last visited September 11, 2026).

[16] *See Important Updates Regarding Campus Access,* Columbia University, Office of the President (September 7, 2025) https://president.columbia.edu/news/important-updates-regarding-campus-access.

race, religion, or "any other applicable, legally protected status" in the administration of Columbia University's educational policies, programs, and functions.

281. Pursuant to its Non-Discrimination Statement and Policy, Columbia University's Student Anti-Discrimination and Discriminatory Harassment Processes require that, upon receiving a report of harassment, OIE, or the applicable disciplinary body, is required to acknowledge receipt of the complaint and then to either meet with the reporting student to gather additional information or to begin a formal investigative process.[17]

282. Plaintiffs relied on these promises as students by paying tuition to Columbia.

283. Under New York state law, the relationship between a student and a higher education institution is regarded as contractual in nature. As such, the terms of a higher education institution's student handbooks, university bulletins, regulations, codes, policies, and procedures are contractually enforceable upon receipt of tuition.

284. Accordingly, Defendants breached their express contracts with Plaintiffs when, as described herein, Defendants failed to provide Plaintiffs with a campus free from discrimination and/or harassment based on their membership in a protected class.

285. As a proximate and foreseeable consequence of the foregoing breaches Plaintiffs Mr. Khalil, Mr. Zubairi, and PWG's student members, sustained damages, including, but not limited to, emotional distress, psychological damages, loss of future educational and career opportunities, reputational damages, economic injuries, and other direct and consequential damages.

286. As a result of the foregoing, Plaintiffs are entitled to damages in an amount to be

[17] *See Student Anti-Discrimination and Discriminatory Harassment Process*, Columbia University, Office of Institutional Equity, https://institutionalequity.columbia.edu/sites/institutionalequity.columbia.edu/files/content/Flow%20Charts/Student_ADDH_Process_Flowchart.pdf (last visited September 11, 2026).

determined at trial, in addition to pre-judgment interest, attorneys' fees, expenses, costs, and disbursements.

## COUNT VI
## Breach of the Implied Covenant of Good Faith and Fair Dealing

287. Plaintiffs repeat and reallege the allegations of the preceding paragraphs as though fully stated herein.

288. Defendants have breached the implied covenant of good faith and fair dealing implied in its contracts with students, including Mr. Khalil, Mr. Zubairi, and PWG's student members. Among other things, Defendants selectively apply or enforce their student handbooks, guidelines, policies, procedures, course catalogs, registration materials, bulletins, circulars, and regulations in bad faith and discriminatory way — improperly motivated by shared ancestry, race, ethnic characteristics, and/or national origin bias — treating incidents of abuse, harassment, and intimidation against perceived Arab, Muslim, and/or Palestinian students, including Plaintiffs Mr. Khalil, Mr. Zubairi, and PWG's student members, in a disproportionately lenient, tolerant, forgiving, and nonchalant manner.

289. As a result of Defendants' breaches, Plaintiffs Mr. Khalil, Mr. Zubairi, and PWG's student members have been damaged, and continue to sustain substantial damages, in amounts to be determined at trial.

## JURY TRIAL DEMANDED

Plaintiffs hereby demand a jury trial for all issues so triable.

## PRAYER FOR RELIEF

**WHEREFORE**, in light of the foregoing facts, Plaintiffs respectfully pray and request that this Court grant the following relief:

a. Injunctive relief enjoining Columbia University and its agents, including Dean Keren Yarhi-Milo in her official capacity, from

violating Title VI, including by: (i) enjoining them from establishing, implementing, instituting, maintaining, or executing discriminatory policies, practices, procedures, or protocols; (ii) ordering that Columbia University and SIPA take all necessary and appropriate remedial and preventive measures against anti-Palestinian, anti-Arab, and anti-Muslim discrimination and harassment; and (iii) ordering Defendants to take all necessary and appropriate remedial measures to prevent further harm to name Plaintiffs Mahmoud Khalil and Mohammad Ibrahim Zubairi, including, but not limited to, by enjoining Defendants from barring these individuals from enjoying the benefits they are entitled to as Columbia alumni, such as being able to access Columbia's campus, including but not limited to the appropriate remedial measures to reinstate Mr. Khalil's access to Columbia's campus;

b. Injunctive relief to end PWG's probation and suspension, and to: (i) restore PWG's ability to host and assist with official and/or unofficial activities, including business meetings, member activities, and community and social events; (ii) restore PWG's ability to use Columbia University's name in advertisements, statements, and on social media; (iii) restore PWG's ability to reserve space and/or hold events on Columbia University's campus; (iv) restore all financial accounts associated with PWG; and (v) allow PWG to return to receiving financial assistance from the University;

c. Compensatory, consequential, and punitive damages in amounts to be determined at trial;

d. Statutory penalties;

e. Reasonable attorneys' fees, costs, and expenses;

f. Pre-judgment interest and post-judgment interest at the maximum rate allowable by the law; and

g. Such other and further relief as this Court deems just and proper.

[SIGNATURES ON FOLLOWING PAGE]

DATED: September 14, 2026

Respectfully submitted,

MAHMOUD KHALIL, MOHAMMAD IBRAHIM ZUBAIRI, and SIPA PALESTINE WORKING GROUP

By their attorneys:

/s/ *William Reynolds*
*(seeking admission phv)*

**WILLIAM REYNOLDS LAW, LTD.**
33 N Dearborn St, Suite 1000
Chicago, IL 60602
(630) 600-9922 (phone)
bill@reynoldsand.com (email)
(*seeking admission phv)*

/s/ *Brittany S. Finley*
*(seeking admission phv)*

**BRITTANY S. FINLEY, ESQ.**
149 26th Street NW
Atlanta, GA 30309
(470) 598-6997 (phone)
brittanysfinley@gmail.com (email)
*(seeking admission phv)*

**ATTORNEYS FOR PLAINTIFFS**