**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

MAHMOUD KHALIL; MOHAMMAD IBRAHIM ZUBAIRI; and SIPA PALESTINE WORKING GROUP;

*Plaintiffs*,

v.

COLUMBIA UNIVERSITY IN THE CITY OF NEW YORK; THE TRUSTEES OF COLUMBIA UNIVERSITY IN THE CITY OF NEW YORK; and KEREN YARHI-MILO, in her capacity as the Dean of Columbia University School of International and Public Affairs;

*Defendants*.

No. 1:26-cv-07977 (VSB) (OTW)

Hon. Vernon S. Broderick
Magistrate Judge Ona. T. Wang

**FIRST AMENDED COMPLAINT AND JURY TRIAL DEMAND**

Dated: November 18, 2026

## Table of Contents

NATURE OF THE CASE ........................................ 1

JURISDICTION AND VENUE ........................................ 6

PARTIES ........................................ 6

STATEMENT OF FACTS ........................................ 8

I. Allegations Pertaining to All Plaintiffs ........................................ 8

II. Additional Allegations Relating to Individual Plaintiffs ........................................ 33

A. Plaintiff Mahmoud Khalil ........................................ 33

B. Plaintiff Mohammad Ibrahim Zubairi ........................................ 39

III. Additional Allegations Relating to Non-Party PWG Members ........................................ 41

A. PWG Member A: Tariq Kenney-Shawa ........................................ 41

B. PWG Member B: Jasmine Dakhil Sarryeh-Jemersic ........................................ 43

C. PWG Member C: Bhavana Bellamkonda ........................................ 45

D. PWG Member D: Tasfia Arshad ........................................ 46

E. PWG Member E: Anonymous ........................................ 47

F. PWG Member F: Anonymous ........................................ 49

G. PWG Member G: Carly Shaffer ........................................ 49

H. PWG Member H: Danial Saiyid ........................................ 50

I. PWG Member I: Anonymous ........................................ 51

J. PWG Member J: Miriam Yousaf ........................................ 51

K. PWG Member K: Phillip Crane ........................................ 52

L. PWG Member L: Anonymous ........................................ 52

M. PWG Member M: Lucas Brooks ........................................ 53

N. PWG Member N: Anonymous ........................................ 54

CAUSES OF ACTION ........................................ 56

COUNT I ........................................ 56

COUNT II ........................................ 58

COUNT III ........................................ 59

COUNT IV ........................................ 62

COUNT V ........................................ 63

COUNT VI ........................................ 63

COUNT VII .....64
COUNT VIII .....65
COUNT IX .....67
COUNT X .....68
PRAYER FOR RELIEF .....69

## FIRST AMENDED COMPLAINT

Plaintiffs MAHMOUD KHALIL, MOHAMMAD IBRAHIM ZUBAIRI, and SIPA PALESTINE WORKING GROUP ("SIPA PWG" or "PWG"), (collectively, "Plaintiffs"), by and through their attorneys, hereby allege as follows:

## NATURE OF THE CASE

1. This case concerns: (1) Defendants' deliberate indifference towards the severe, persistent, and coordinated harassment of its Palestinian, perceived-Palestinian, and non-citizen students, including Mr. Khalil and Mr. Zubairi; (2) Defendants' implementation of policies and procedures that intentionally discriminated against Palestinian, perceived-Palestinian, and non-citizen students, including Mr. Khalil and Mr. Zubairi; (3) Defendants' similar harassment and intentional discrimination against students affiliated with Palestinians, including members of the SIPA Palestine Working Group at Columbia University; and (4) Defendants' subsequent retaliation against Mr. Khalil, Mr. Zubairi, and PWG for reporting that national-origin and/or citizenship-status-based harassment and discrimination. As a result of Defendants' actions, Plaintiffs were stripped of the full benefit of their education at Columbia and subjected to severe mental and emotional harm.

2. Since PWG's formation at Columbia University's School of International and Public Affairs ("SIPA") in 2018, its members have been antagonized and harassed by Columbia students, staff, and faculty, without consequence, because of their actual or perceived Palestinian identity, or because of their status as non-citizens. Driven by animus towards Plaintiffs' and other PWG members' perceived shared ancestry and citizenship statuses, Defendants regularly falsely characterized PWG as a hostile group to justify its differential treatment of the group and its members.

3. In the weeks following October 7, 2023, Mr. Khalil, Mr. Zubairi, and other PWG members were subjected to increasingly targeted and persistent harassment from their peers in school-sponsored group chats, on campus, and in the classroom based solely on their national origin and citizenship status. That harassment included organized doxxing campaigns aided by Columbia students and faculty that were launched against Palestinian, perceived-Palestinian, and non-citizen students at Columbia, including Plaintiffs, which displayed their name, identifying information, and pictures on websites and a box truck that circled Columbia campus labeling targeted students "Columbia's Leading Antisemites."

4. Over the following months, Mr. Khalil, Mr. Zubairi, and other PWG members repeatedly informed Columbia University officials, including SIPA's dean, Karen Yarhi-Milo ("Dean Yarhi-Milo"), of instances of on-campus antagonism and doxxing. Defendants responded with silence and a total lack of any meaningful protection or assistance, making clear their willingness to tolerate and foment a campus atmosphere rife with national-origin and citizenship-status-based hostility.

5. As a result of Defendants' deliberate indifference towards the known severe, pervasive, and objectionably offensive harassment occurring Columbia University, Palestinian, perceived-Palestinian, and non-citizen Columbia University students, including Plaintiffs, became terrified to attend classes, organize and attend on-campus events, and otherwise participate in the educational benefits to which they were contractually entitled.

6. In response to ongoing campus-wide pro-Palestinian student protests, Defendants also developed and implemented updated student conduct policies and procedures to intentionally discriminate against Palestinian, perceived-Palestinian, and/or non-citizen students and student organizations at Columbia – particularly those known to advocate against national-origin and

citizenship-status-based harassment and discrimination. Those policies eventually included an entirely new institutional disciplinary body, the Office of Institutional Equity, whose sole purpose was to deter and punish pro-Palestine advocacy.

7. Throughout this time, Defendants repeatedly characterized PWG as a hostile group to justify labeling its events as "security risks", subjecting the group to heightened event hosting requirements. Those accusations stemmed solely from Defendants' perception of PWG as a group consisting primarily of Palestinian and/or non-citizens students, whom Defendants had prejudiciously stereotyped as violent.

8. By 2025, Defendants were using its new student conduct policies and the OIE disciplinary system to conduct baseless investigations against Plaintiffs based on spurious allegations of discrimination, subjecting Plaintiffs to burdensome and pretextual disciplinary investigations, based solely on their Palestinian or perceived-Palestinian national origin or non-citizen status.

9. Defendants' years-long deliberate indifference to repeated reports of national-origin and citizenship-status based harassment with their intentional discrimination of Plaintiffs Mr. Khalil, Mr. Zubairi, and other PWG members reached its logical endpoint when, on March 6, 2025, a Columbia University professor and a fellow Columbia student doxxed Mr. Khalil, falsely accused him of terrorist activity, and publicly asked the Secretary of State to take "strong action" against him.

10. Mr. Khalil had repeatedly informed Defendants of this targeted harassment numerous times as the harassment escalated, including on March 7, 2025, when he emailed Columbia's interim president, Dr. Katrina Armstrong, and other Columbia administrators, begging that they take immediate action to protect himself and other students who were being doxxed and

harassed by Columbia faculty and students. Defendants again intentionally declined to act.

11. One day later, on March 8, 2025, Mr. Khalil was illegally abducted by plainclothes ICE officers at his Columbia-owned residential apartment building and was subsequently detained for 104 days in an ICE facility in Jena, Louisiana before his eventual release on bail on June 20, 2025.

12. In the weeks following Mr. Khalil's abduction, Mr. Zubairi and other PWG members attempted to organize an effort calling for Mr. Khalil's release and to spread know-your-rights information to other non-citizen students. In response, Mr. Zubairi and other members of PWG were subjected to even more egregious and intolerable peer-on-peer harassment because of their perceived-Palestinian ancestry or non-citizen status, and because they were advocating for

13. Mr. Zubairi and PWG again repeatedly notified Defendants of the national-origin and citizenship-status-based harassment they had experienced and witnessed following Mr. Khalil's unlawful kidnapping. In response, Defendants initiated pretextual disciplinary proceedings against Plaintiffs to punish and retaliate against them for filing reports and used these baseless disciplinary charges to justify suspending PWG as a registered student organization. PWG remains banned from campus to this day.

14. Defendants' conduct placed Palestinian, perceived-Palestinian, and non-citizen students at Columbia, including Plaintiffs, at serious risk of violence and caused them sustained, ongoing financial and emotional harm in violation of both federal and state laws. Specifically, Defendants:

> (1) forced Plaintiffs Mr. Khalil, Mr. Zubairi, and other PWG members to endure unjustifiably hostile harassment based on their actual or perceived national origins, thereby depriving them of the full benefit of their education in violation of the rights and protections guaranteed to them under Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d;

(2) intentionally applied policies and procedures in a manner that discriminated against Plaintiffs Mr. Khalil, Mr. Zubairi, and PWG based on their actual or perceived national origins, thereby depriving Plaintiffs of the full benefit of their education in violation of the rights and protections guaranteed to them under Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d;

(3) retaliated against Plaintiffs Mr. Khalil, Mr. Zubairi, and PWG for reporting and/or advocating against that harassment and discrimination in violation of the implicit protection against retaliation included in the text of section 601 of Title VI, 42 U.S.C. § 2000d;

(4) engaged in an unlawful discriminatory practice as an educational institution by permitting the harassment of Plaintiffs Mr. Khalil, Mr. Zubairi, and PWG based on their national origin, citizenship, and/or immigration status in violation of New York Executive Law § 296(4);

(5) engaged in an unlawful discriminatory practice as an educational institution by denying Plaintiffs Mr. Khalil, Mr. Zubairi, and PWG the use of Columbia University facilities based on their national origin, citizenship, and/or immigration status in violation of New York Executive Law § 296(4);

(6) retaliated against Plaintiffs Mr. Khalil, Mr. Zubairi, and PWG for opposing and/or reporting Defendants' unlawful discriminatory practices in violation of New York Executive Law § 296(7);

(7) refused, withheld and denied Plaintiffs Mr. Khalil, Mr. Zubairi, and PWG the accommodations, advantages, facilities or privileges of Columbia University, as a place of public accommodation, in violation of New York City Administrative Code § 8-107(4);

(8) failed to ensure that Plaintiffs Mr. Khalil and Mr. Zubairi would be free to engage in academic pursuits, including participating in registered student organizations, without serious intrusion, thereby breaching the express and implied contractual obligations they owed Plaintiffs pursuant to their Rules of University Conduct and Anti-Discrimination and Discriminatory Harassment Policy;[1] and

[1] *See Rules of University Conduct*, Columbia University (last updated Sept. 27, 2025) https://universitypolicies.columbia.edu/content/rules-university-conduct; *Anti- Discrimination and Discriminatory Harassment Policy and Procedures for Students*, Columbia University (effective September 30, 2025) https://universitypolicies.columbia.edu/content/anti-discrimination-and-discriminatory-harassment-policy-and-procedures-students.

> (9) unambiguously promised to allow PWG to continue operating as a registered student organization at Columbia University pursuant to it meeting certain conditions, then unjustifiably indefinitely suspended PWG from operating at Columbia despite PWG satisfying all of its obligations.

15. Plaintiffs now seek redress.

## JURISDICTION AND VENUE

16. This Court has subject matter jurisdiction under 28 U.S.C. §§ 1331 and 1343 over claims arising under Title VI of the Civil Rights Act of 1964 ("Title VI") (42 U.S.C. § 2000d *et seq.*).

17. This Court has supplemental jurisdiction over Plaintiffs' related state law claims under 28 U.S.C. § 1367(a) because those claims arise out of the same case or controversy as Plaintiffs' federal claims.

18. This Court has personal jurisdiction over Defendants because they are based out of and operate in the state of New York. Defendant Keren Yarhi-Milo, in her official capacity, is located on SIPA's campus in New York, New York, and, as such, this Court has personal jurisdiction over her in this capacity.

19. This Court has the authority to provide preliminary and permanent injunctive relief pursuant to Rule 65 of the Federal Rules of Civil Procedure.

20. Venue in the Southern District of New York is proper under 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in its judicial district and Defendants are located within this District.

## PARTIES

21. Plaintiff Mahmoud Khalil ("Mr. Khalil") is a lawful permanent resident of the

United States of America. He is married to a U.S. citizen and father to a one-year-old son born in the United States. Between 2023 and 2025, Mr. Khalil was a SIPA student and served as the president of PWG. Mr. Khalil is of Palestinian national origin, holds an Algerian passport, and identifies as Arab. He is deeply committed to international human rights and public service.

22. Plaintiff Mohammad Ibrahim Zubairi ("Mr. Zubairi") is a citizen of Pakistan. From 2024 through 2026, Mr. Zubairi was enrolled as a student at SIPA. He is the current president of PWG. Mr. Zubairi identifies as Muslim.

23. Plaintiff SIPA Palestine Working Group ("SIPA PWG" or "PWG") is a student organization that was formally registered in accordance with Columbia University's applicable policies in 2018. It operates pursuant to bylaws and is governed by an executive board elected by fellow members. Membership in PWG is lifelong, *i.e.,* even after graduating from SIPA, individuals are still considered PWG members.

24. Defendant Columbia University in the City of New York ("Columbia University" or "Columbia") is a private, higher-education institution. Columbia maintains and operates a university campus in the Morningside Heights neighborhood of New York City, located at 420 W 118th Street, New York, New York 10027, on which its School of International and Public Affairs ("SIPA") is located and where the actions alleged herein primarily occurred. Columbia receives substantial federal government funding and is a place of public accommodation.

25. Defendant Dean Keren Yarhi-Milo ("Dean Yarhi-Milo") is the dean of SIPA at Columbia University and has served in this position since July 2022. Dean Yarhi-Milo is sued herein in her official capacity.

26. Defendant Trustees of Columbia University in the City of New York (individually, "Trustees," or, collectively, alongside Columbia University and Dean Yarhi-Milo, "Defendants"), is a 501(c)(3) organization that functions as Columbia's primary governing body.

## STATEMENT OF FACTS

### I. Allegations Pertaining to All Plaintiffs

#### A. Defendants have long been deliberately indifferent to the peer-to-peer harassment against Palestinian, perceived-Palestinian, and non-citizen students while simultaneously directly discriminating against such students themselves.

27. SIPA PWG has been a registered student organization at Columbia University's School of International and Public Affairs since 2018. It was formed for the purpose of promoting awareness and advocacy regarding issues affecting the nation of Palestine, Palestinian people, and the broader Arab community.[2]

28. Since its formation, Defendants and much of the Columbia University community at large have perceived PWG's members as being Palestinian due to the group's outwardly pro-Palestine stance and it primarily consisting of Arab and non-white-presenting individuals, including many non-citizens.

29. Defendants have also long disingenuously portrayed PWG as a hostile, violent, and

---

[2] In full, SIPA PWG's mission statement reads as follows:

> Our group represents a new effort to raise awareness, increase understanding, and promote engagement among the SIPA and Columbia student body on Palestine. We meet, organize, and advocate in order to encourage a more holistic understanding of Palestine, with specific attention devoted to the political, social, economic, cultural, historical, and legal circumstances that have influenced the past and shape the future. Our goal is to serve as a source of information and a means of education on an issue that is often absent from academic and social life at SIPA. To reach these goals, we seek to provide SIPA students, and all who participate in our events, with exposure to Palestinian perspectives. Our events include speaking engagements by leading political and intellectual figures in Palestine and related issues, the hosting and co-sponsoring of cultural activities, and potential opportunities for tourism and travel in Palestine. Through these events and others, we address the topics of human and civil rights in contemporary Palestine, the nature and characteristics of historical and contemporary Palestinian identity, and the role of policy and a SIPA education in present-day circumstances, particularly the Occupation and struggle for liberation.

terroristic group – and allowed Columbia University faculty and students to do the same – solely because of its members' perceived national origins, citizenship statuses, and pro-Palestine viewpoints.

30. PWG's members have persistently been subjected to national-origin and citizenship-status-based harassment on Columbia's campus by other students; a fact of which Defendants are well-aware. Palestinian or perceived to be Palestinian students across Columbia at large have been subjected to similar on-campus hostility, particularly when expressing pro-Palestine sentiments.

31. For example, in Spring 2022, Columbia University students wearing a keffiyeh (a traditional Arab and Muslim scarf that is considered a symbol of Palestinian solidarity) were harassed by fellow students who referred to the keffiyeh as "what terrorists wear."

32. Around that same time, PWG was forced to reschedule its annual Palestine Trek ("PalTrek") trip for fear of the hostility they would face from peers after arriving back on campus at the same time as those students who took a similar trip to Israel. PWG had previously organized and ran a PalTrek trip each year since its formation without incident.

33. In July 2022, Defendant Trustees appointed Defendant Keren Yarhi-Milo, an Israeli-American citizen and former Israeli military intelligence official,[3] to be SIPA's dean. In that role, Dean Yarhi-Milo took many actions that intentionally discriminated against Palestinian, perceived Palestinian, and non-citizen students – particularly those who outwardly held pro-Palestine views – and which caused the on-campus harassment of those students to notably worsen.

34. For example, in Spring 2023, PWG planned an educational event titled "Travel to Israel and Palestine: What to Know Before You Go." Without reason and in violation of

---

[3] Keren Yarhi-Milo and Amaney Jamal, *The Discourse is Toxic. Universities Can Help*, The New York Times (Oct. 30, 2023), https://archive.is/bZ5lG.

Columbia's University Event Policy, Defendants subjected PWG to heightened "special event" approval requirements that, upon information and belief, were not imposed on similarly-situated student groups whose members were not perceived to share Palestinian ancestry or who were not non-citizens. PWG had never had a single instance of violence occur at any of its prior gatherings that would have justified this designation.

35. PWG attempted to comply with these additional "special event" requirements so that its event would be allowed to proceed. However, on the day of the event, Defendants dispatched Public Safety officers to monitor the individuals in attendance.[4] Defendants only dispatched Public Safety to PWG's event because PWG's members were primarily perceived as having Palestinian ancestry and/or as being non-citizens.

36. Because Public Safety was known to have previously engaged in confrontations with students, its presence and intense surveillance understandably discouraged attendance at PWG's event and made the group's members fear that they would be physically harmed or otherwise targeted because of their actual or perceived national origin or citizenship status.

37. Also in Spring 2023, PWG planned an event featuring Omar Shakir ("Mr. Shakir") who, at that time, served as the Israel and Palestine Director at Human Rights Watch. To advertise that event, PWG posted flyers around Columbia's campus, in full compliance with the school's Bulletin Board Policy. Columbia University students and/or community members repeatedly tore down those flyers attempting to intimidate and antagonize PWG's Palestinian, perceived-Palestinian, and/or non-citizen members and to make it more difficult for the group's members to learn about and attend the event.

38. Although PWG repeatedly reported these and other instances of on-campus

[4] Public Safety acts as on-campus police personnel at Columbia University.

national-origin and citizenship-status based harassment, Defendants made no effort to investigate the alleged misconduct. To the contrary, Defendants even threatened to cancel the Omar Shakir event, asserting that the gathering posed a "security risk." Again, this characterization was groundless and, upon information and belief, based solely on Defendants prejudicially assuming PWG's group members were Palestinian or non-citizens and therefore inherently hostile or violent. Only after Defendants could find no legitimate basis to cancel the event did they relent and allow PWG to host Mr. Shakir.

39. Nonetheless, on the day of the event, Defendants dispatched Public Safety, instructing that they check and scan each attendees' ID and otherwise surveil the event. Once again, Public Safety's presence and intense surveillance was unjustifiable; Defendants' deployment of Public Safety was motivated solely by the fact that PWG's members were Palestinian, perceived-Palestinian, and/or non-citizens whom Defendants saw as violent.

40. Upon information and belief, the "security risk" designation was not placed on similarly situated students or student organizations who were not Palestinian, perceived Palestinian, or non-citizens.

**B. After October 7, 2023, national-origin and citizenship-status-based harassment on Columbia's campus significantly escalated, yet Defendants remained deliberately indifferent and continued their own affirmative discrimination.**

41. In response to Israel's military attack on Gaza beginning after October 7, 2023, Columbia University students began organizing a series of student protests opposing the school's institutional support of the destruction of Gaza. Immediately thereafter, animosity towards Palestinian, perceived Palestinian, and non-citizen students at Columbia – especially those holding pro-Palestine viewpoints – significantly escalated.

42. Palestinian, perceived Palestinian, and non-citizen students, including Plaintiffs,

were routinely labeled as violent aggressors and terrorists by Columbia University students, faculty, and staff members without consequence. For example, on October 9, 2023, a student wearing a keffiyeh walked past a vigil with Israeli flags and took a photograph from afar. A fellow Columbia student approached her and demanded her University ID and accused her of harassment simply for wearing a keffiyeh. When the keffiyeh-wearing student refused, the other student responded saying, "Fuck you, you're a terrorist."

43. Additionally, on October 9, 2023, PWG sent an email to leadership at SIPA's Institute for Global Politics ("IGP"), including to Dean Yarhi-Milo, to request that Palestinian voices be included in an upcoming "Assessing Israel's Next Moves" panel sponsored by SIPA. This panel was intended to acknowledge Israel's disproportionate military response to the October 7, 2023, attack. Defendants intentionally and unjustifiably chose to exclude Palestinian individuals and viewpoints from that panel, further what PWG called at the time "another example of SIPA's continuous Palestinian erasure in academic spaces."

**C. Defendants' intentional actions and non-response to reported harassment directly led to the launching of targeted doxxing against Palestinian, perceived-Palestinian, and non-citizen Columbia students.**

44. On October 9, 2023, Plaintiff PWG signed a joint statement[5] wherein, on behalf of its members and alongside other Columbia University Palestine solidarity groups, it condemned Israel's murder of Palestinian civilians following October 7, 2023, and called for Defendants to reassess their ties with Israel.

45. On October 13, 2023, PWG members informed Dean Yarhi-Milo that students at

[5] *Joint Statement from Palestine Solidarity Groups at Columbia University regarding the recent events in Palestine/Israel: Oppression Breeds Resistance*, https://docs.google.com/forms/d/e/1FAIpQLSeHe5p0in9g4h9xURoTx6NPn-v2rb-m7k6ZIm4YNGqOPRVsFQ/viewform (last visited Sept. 9, 2026).

Harvard University who had signed a similar statement were had been doxxed and subjected to horrific threats and accusations,[6] reasonably leading them to fear being similarly doxxed and harassed in retaliation for the group having signed the joint statement.

46. Accordingly, Plaintiff PWG asked that Defendants: (1) remove its members' personal information and photos from public forums; and (2) hide its officer list from CampusGroups, the password-protected platform that Defendants used as a directory for student organizations and their members.

47. Defendants intentionally disregarded Plaintiffs' legitimate concerns for their safety and fear of harassment and instead explicitly refused to take the two simple actions that could have easily protected their students.

48. Then, on October 13, 2023, Dean Yarhi-Milo – recklessly, and without any regard for the fact that PWG members had just told her that they feared being doxxed and consequently harmed – published an article in The Atlantic that repeatedly framed Arabs as "the enemy."[7] Defendants amplified Dean Yarhi-Milo's article by publishing it on SIPA's website.[8]

49. Defendants' endorsement of Dean Yarhi-Milo's sentiments made Plaintiffs reasonably believe that their peers and faculty members at Columbia University may accept as true these bigoted stereotypes about Palestinian and Arab individuals being violent aggressors. This action made actual and perceived Palestinian Columbia University students, including Plaintiffs, fear for their safety on campus.

---

[6] Max J. Krupnick, *Two Years of Doxxing at Harvard*, Harvard Magazine (Aug. 8, 2025), https://www.harvardmagazine.com/university-news/harvard-doxxing-free-speech.

[7] Keren Yarhi-Milo and Tim Naftali, T*he Lessons Israel Failed to Learn From the Yom Kippur War*, The Atlantic (Oct. 13, 2023), https://www.theatlantic.com/ideas/archive/2023/10/israel-yom-kippur-war-lessons-hamas/675627/.

[8] *The Lessons Israel Failed to Learn From the Yom Kippur War*, Columbia University, School of International and Public Affairs (Oct. 17, 2023), https://www.sipa.columbia.edu/news/lessons-israel-failed-learn-yom-kippur-war.

50. Such fears proved to be well-founded. On or around October 25, 2023, a box truck displaying PWG members' full names and CampusGroups photos on massive electronic screens began circling the perimeter of Columbia University's Morningside Heights campus, where SIPA was located. As depicted below, this doxxing truck labeled various PWG members as "Columbia's Leading Antisemites."




*Photo A*:
Doxxing truck on Columbia University's campus displaying PWG Member C's full name and face (redacted for privacy purposes).




*Photo B*:
Doxxing truck on Columbia University's campus displaying PWG Member I's full name and face (redacted for privacy purposes).

51. The appearance of the doxxing truck coincided with widely publicized incidents of violence targeting Palestinian individuals living in the United States. For example, only a week prior, a six-year-old Palestinian boy was murdered and his mother was severely injured in a targeted attack at their home in Plainfield Township, Illinois because they were known to be Palestinian.

52. Terrified for their safety, PWG members met with Dean Yarhi-Milo on or around October 25, 2023, to discuss the doxxing truck and Defendants' role in allowing that coordinated doxxing campaign to unfold.

53. During the October 25, 2023, meeting, PWG members raised the fact that many of the student photographs displayed on the truck were accessible only through Columbia's CampusGroups platform, which, upon information and belief, was accessible only to Columbia University community members. However, when PWG suggested that this may indicate that an individual associated with Columbia was responsible for supplying the photos used on the doxxing truck, Dean Yarhi-Milo reacted with hostility, dismissing PWG's concerns as "harmful to campus culture" and refusing to investigate the matter further. Once more, Defendants remained deliberately indifferent to the known harassment of students on their campus motivated solely by those students Palestinian national origin, perceived-Palestinian national origin, or non-citizen status.

54. Throughout their meeting with Dean Yarhi-Milo and other Columbia leadership, PWG members realized that comments made by white-presenting and Jewish members received more discussion and more favorable responses from the University representatives, and purposefully enacted a strategy by which those students would repeat points that were earlier made by Palestinian or perceived Palestinian PWG members that the University dismissed.

55. On or around October 28, 2023, Defendants finally removed doxxed PWG members' full names and pictures from CampusGroups. This delayed "solution" had an inconsequential effect; every day for the next three weeks, the doxxing truck continued to circle the Morningside Heights campus where SIPA was located. During that time, Defendants were aware of, yet did nothing to stop, the doxxing truck from returning to campus.

56. In addition to the doxxing truck, PWG members were being targeted by a coordinated online doxxing and harassment campaign that involved social media and database websites collecting and displaying their personal information. Columbia students, professors, and alumni worked alongside third party groups to identify and target Palestinian, perceived-Palestinian and non-citizen students on Columbia's campus, including Plaintiffs.

57. For example, Victor Muslin ("Mr. Muslin"), a Columbia University alum, had personally attended multiple pro-Palestine protests on Columbia's campus in order to collect information about the identities of pro-Palestine students in attendance who he perceived as being Palestinian or non-citizens.[9]

58. Mr. Muslin is a prominent figure in Canary Mission, an organization that doxxes and blacklists individuals who share pro-Palestine beliefs. He has explicitly admitted that he drafted and maintained a list of pro-Palestine, non-citizen Columbia University students whom he identified during on-campus protests for the purpose of harassing those individuals.[10] PWG members were among those identified by Mr. Muslin.

59. As the doxxing and harassment campaign continued, several PWG members experienced severe mental anguish. One PWG member reported that she had begun "self-harm[ing] … develop[ed] suicidal tendencies, [and had] [] be[come] paranoid about [even] stepping out of the house[,]" which, in turn, caused her to miss classes and be unable to benefit from other academic opportunities.

60. Defendants' deliberate indifference to the doxxing truck and websites inflicted significant harm on PWG members, subjecting them to an unreasonably hostile environment, and interfering with the educational experiences to which they were contractually entitled.

---

[9] *Khalil v. The Heritage Found.*, No. 1:26-cv-05929, Compl. at 55-56 (S.D.N.Y. July 14, 2026).
[10] *Id.* at 56.

61. Defendants' deliberate indifference to growing on-campus hostility towards Palestinian, perceived-Palestinian, and non-citizen students was further demonstrated when it again took no action to address the ongoing harassment of its students when, in November 2023, three Palestinian-American college students wearing keffiyehs were shot and seriously injured in an unprovoked attack near the University of Vermont. This incident and Defendants' lack of response caused Plaintiffs to be unable to focus in class, enjoy Columbia's facilities, and ultimately receive the full benefit of the education to which their tuition entitled them.

**D. Defendants continued to ignore the severe doxxing of PWG members and implemented an official policy of disproportionately punishing Palestinian, perceived-Palestinian, and non-citizen students, thereby directly harassing Plaintiffs themselves.**

62. On November 16, 2023, Columbia University Professor Rashid Khalidi was scheduled to speak at an event organized by PWG. However, just four hours before the event was scheduled to begin, SIPA canceled the event because it allegedly posed a "security risk."

63. Mr. Khalil and other PWG members organized to push back against the last-minute cancelation. Upon information and belief, a SIPA professor became aware of what was occurring during the initial cancelation, after Mr. Khalil and other PWG members went to the professor for help while she was teaching a Human Rights course at SIPA and the human rights professor raised the concern of SIPA's disparate treatment of PWG to her human rights class in front of multiple PWG members.

64. After Mr. Khalil and other PWG members pushed back against the baseless cancellation and notified a professor of human rights at SIPA who raised concerns of disparate treatment, Defendants backtracked and allowed the event to proceed but required the event's organizers to: (1) allow Public Safety be heavily present throughout the event; and (2) allow Public Safety to solicit and scan the campus ID of each attendee. Public Safety's presence and intense

surveillance intimidated PWG members and discouraged other SIPA students from attending the event.

65. Defendants only subjected PWG to such heightened requirements because of their bigoted characterization of PWG and its members as "violent" or "hostile" because Defendants perceived them to be Palestinian and/or non-citizens. Upon information and belief, similarly-situated student groups were not subject to similar heightened requirements when hosting similar events with Columbia professors.

66. Also in November 2023, PWG posted filers advertising a screening of the film *Killing Gaza* on bulletin boards located around SIPA's campus and held open to student organizations. Shortly thereafter, other SIPA students and/or community members tore down these flyers in an effort to intimidate PWG's members and prevent attendance at the event.

67. Once again, Public Safety's presence and intense surveillance intimidated PWG members, discouraged other SIPA students from attending the event, and sent the campus community the message that Defendants believed that Columbia's Palestinian, perceived Palestinian, and non-citizen students were inherently dangerous people.

68. On, or around, November 29, 2023, a PWG board member, Philip Crane, reported the *Killing Gaza* flier incident to SIPA leadership. Defendants again disregarded the report, declining to investigate or take measures to discourage such behavior.

69. Shortly thereafter, PWG posted flyers advertising another event that had been authorized by SIPA's Office of Student Affairs ("OSA") and displayed in compliance with SIPA's Bulletin Board Policy.

70. On December 7, 2023, in violation of Defendants' own policy, an employee of Dean Yarhi-Milo's office tore down one of these PWG fliers due to that office's animus towards

PWG and its Palestinian or perceived-Palestinian national origin or non-citizen students. Upon information and belief, posters from similarly-situated student organizations were not torn down by individuals employed by Defendants, presumably because they were not posted by groups whose members were perceived to be Palestinian, non-citizens, and/or associated with Palestinians through PWG.

71. After PWG reported the event to OSA and asked for clarification regarding the flyer's removal for several weeks, OSA itself confirmed that an individual from Dean Yarhi-Milo's office had removed the flyer in violation of SIPA policies. Nevertheless, Defendants remained deliberately indifferent to that employee's harassment and refused to take any remedial action.

72. On or about January 19, 2024, a PWG member was one of several students sickened and hospitalized after two Columbia University students, Menachem Mendel Perez and Yuval Hadari, purposely sprayed students with "Liquid Ass" and "Wet Farts" in an unprovoked attack. The attack was motivated by the Perez's and Hadari's animus towards Palestinian and perceived-Palestinian individuals and non-citizens.[11]

73. Although Defendants identified Perez and Hadari and temporarily suspended both students, it took no further action to protect its Palestinian, perceived-Palestinian, and non-citizen students and remained deliberately indifferent to the escalating harassment of those students.

74. Upon information and belief, reports of other physical harassment on Columbia's campus by individuals who were not Palestinian, perceived-Palestinian, or non-citizens were taken seriously, and the offending individuals were punished pursuant to Defendants' Anti-

[11] *Curran-Groome, et. al. v. Columbia University*, Index No. 650605/2025, Compl. at 64-67 (Sup. Ct. N.Y. Feb. 3, 2025); "Professors Slam Columbia's Response to Chemical Skunk Attack on Students at Pro-Palestine Protest," Democracy Now, January 25, 2024, available at https://www.democracynow.org/2024/1/25/columbia_palestine_protest_attack (last accessed Nov. 3, 2026).

Discrimination and Discriminatory Harassment Policy and Procedures. That disparate treatment continues to this day; Defendants recently reinstated and paid a substantial amount of money in response to a lawsuit alleging that their punishment of Perez and Hadari for "harmlessly exercising [their] freedom of expression" was too severe.[12]

75. On February 19, 2024, a PWG member reported that Benjamin Kava, a student enrolled at SIPA, had torn down a PWG flyer while exclaiming, "I don't want to see this shit!" Although this incident was promptly reported to SIPA leadership, Defendants once more chose to take no action in response to the report.

76. Over the next several months, Defendants continued to foster a hostile environment on campus by: (1) sanctioning on-campus harassment and threats of violence against outwardly pro-Palestine students who were perceived as having shared Arab and/or Muslim ancestry, or who were perceived as immigrants and/or non-citizens, such as PWG members; (2) publicly and privately vilifying PWG and its members to restrict the group's ability to organize and meet on campus; and (3) taking action that purposefully inflamed on-campus tensions.

77. Then, in furtherance of its targeted harassment towards pro-Palestine students, Columbia University formed a new, secretive disciplinary body, the Office of Institutional Equity ("OIE"), in August 2024 to enact its official policy of punishing Palestinian, perceived-Palestinian and/or non-citizen students.

78. Prior to the creation of the OIE, disciplinary processes for students charged with violations of the Rules of University conduct were overseen by boards of peer-elected students. Allegations against individual students were reviewed by the University Judicial Board ("UJB")

[12] *Doe v. Columbia University*, No. 1:24-cv-02870, Compl. at 1 (S.D.N.Y Apr. 16, 2024).

and allegations against student groups were reviewed by the Student Governing Board ("SGB") or the Student Group Adjudication Board ("SGAB").

79. Defendants shifted disciplinary review power from the hands of these peer elected boards, into those of a limited number of OIE investigators, many of whom are attorneys chosen by Defendants.

80. OIE's website claims that the office "serves as a centralized resource for addressing all reports of discrimination and discriminatory harassment including reports that involve alleged violations of Title VI . . . whether the Respondent is a student, faculty, staff member, or affiliate."[13]

81. In reality, OIE was used as an official policy whereby Defendants could harass Mr. Khalil, Mr. Zubairi, and other PWG members and punish Palestinian, perceived-Palestinian, and non-citizen students under the pretext of addressing discrimination.

82. Upon its creation, Defendants made OIE responsible for the required Title VI Training for all Columbia University faculty, staff, researchers, librarians, contractors, and student workers.

83. By the Fall 2024 semester, OIE had significantly altered previous Title VI training to specifically target Palestinian, perceived-Palestinian and non-citizen students who advocated for Palestine on Columbia's campus. Specifically, the revised Title VI Training utilized examples that equated any criticism of a country's military or governmental conduct with criticism based on nationality in violation of Title VI, such that any on-campus criticism of Israel's military or government conduct would now constitute a Title VI violation under the OIE's Anti-Discrimination and Discriminatory Harassment Policy. Such criticism is not, in fact, a violation of Title VI.

---

[13] *See* https://institutionalequity.columbia.edu/ (last visited September 8, 2026).

84. In effect, through its revised Title VI Training, the OIE was directly telling Palestinian, perceived-Palestinian, and non-citizen students that advocated for Palestine that they would be punished pursuant to the school's official policy.

85. Alongside and in furtherance of OIE investigations, Defendants often deployed a coordinated surveillance campaign against targeted students. That surveillance included hiring private investigators to monitor and question students about their pro-Palestinian affiliation and the use of campus CCTV footage and data from student ID swipes to harass, intimidate, and retaliate against actual and perceived Palestinian and non-citizen students who advocated for Palestine.

86. Within months of OIE's creation, Mr. Khalil, at that time the President of PWG, became the subject of numerous unfounded complaints, investigations, and charges of misconduct, purportedly based on false allegations of antisemitic, discriminatory, and/or disruptive conduct.

87. PWG in its capacity as a group and other PWG members in their individual capacity were likewise subjected to unfounded complaints, investigations, and charges alleging discrimination.

88. For example, in February 2025, Defendants, through OIE, brought their first meritless discrimination charge against PWG and initiated disciplinary proceedings against the group. This charge suggested that posts which PWG had jointly shared on its Instagram account that criticized Dean Yarhi-Milo and former U.S. Ambassador to Israel and Columbia Professor, Jacob Lew, had created a hostile working environment for these two high-ranking university faculty members.

89. This pretextual allegation brought against PWG reflected the deployment of an

official policy whereby Defendants used the OIE to target Palestinian, perceived-Palestinian, and non-citizen students who advocated for Palestine. As part of the lengthy disciplinary proceedings, students had to miss class to attend disciplinary hearings, draft personal statements, and manage their cases to the detriment of their academic experiences. In dealing with Defendants' targeted investigations, students were unable to receive the full benefit of their education at Columbia.

90. Upon information and belief, similarly-situated students and student groups who were not Palestinian, perceived to be Palestinian, or non-citizens were not subject to the same types of disciplinary proceedings for similar behavior. PWG repeatedly reported the disparate effect of the investigations on its members' educational experience to Defendants through emails to the OIE and submitted statements. *See Exhibit A and B attached hereto and incorporated by reference.* Nevertheless, Defendants continued their meritless investigations.

91. At the same time, Defendants continued to take deliberate, intentional actions that inflamed on-campus tension and embolden individuals who continued to harass Palestinian and perceived Palestinian students.

92. For example, on March 4, 2025, SIPA invited former Prime Minister of Israel, Naftali Bennet ("Mr. Bennet"), to speak on campus. Mr. Bennet is a staunch Zionist who has previously made inflammatory public comments that endangered Palestinians, such as when he boasted that he has "killed lots of Arabs in [his] life and there's no problem with that."[14]

**E. Defendants' deliberate indifference to peer-on-peer harassment, paired with their own harassment and official policy of disparately punishing Palestinian, perceived-Palestinian, and non-citizen students eventually culminated in ICE's illegal kidnapping of Mr. Khalil.**

93. On or around March 6, 2025, an assistant professor at Columbia University, Shai

[14] *Naftali Bennett: I've Killed Lots of Arabs In My Life And There's No Problem With That*, HuffPost (Jul. 29, 2013), https://www.huffpost.com/entry/naftali-bennett-kill-arabs_n_3670767.

Davidai, ("Professor Davidai") and Columbia University student, David Lederer ("Mr. Lederer") doxxed Mr. Khalil, falsely accused him of "distributing terrorist propaganda," and called for his deportation via social media posts.




*Photo C:*
Former Columbia University Professor Shai Davidai addresses U.S. Secretary of State Marco Rubio and calls for Mr. Khalil's deportation in a post on "X" reposting Columbia University undergraduate student David Lederer's post targeting Mr. Khalil.

94. Upon information and belief, Defendants were aware of Professor Davidai and Mr. Lederer each having a documented history of antagonizing and harassing pro-Palestine student

protesters and were immediately made aware of the social media post by Mr. Khalil and others.

95. On January 31, 2025, Mr. Khalil emailed Columbia's interim president, Dr. Katrina Armstrong ("Dr. Armstrong") and other administrators urging Columbia to take immediate action to protect international students facing severe and pervasive doxxing, discriminatory harassment, and potential deportation. He wrote: "*Columbia is now on notice that its students are being actively, severely, and pervasively targeted, harassed, and threatened by various doxing campaigns, some of which have a presence on its campus. Columbia must intervene to protect those international students whose ability to remain in the U.S. to complete their studies is at risk, and in some severe cases, whose lives are put at risk by these doxing campaigns.*"

96. Defendants failed to respond to Mr. Khalil's email and declined to investigate or take action against Professor Davidai or Mr. Lederer for harassing, doxxing, and smearing a fellow member of the Columbia University community.

97. On March 7, 2025, Mr. Khalil again emailed Dr. Armstrong and other Columbia administrators, reiterating his plea that Columbia to take immediate action to protect himself and other students, who were still facing severe and pervasive doxxing, and potentially deportation. He wrote: "*I haven't been able to sleep, fearing that ICE or a dangerous individual might come to my home. I urgently need legal support, and I urge you to intervene and provide the necessary protections to prevent further harm.*" *See Exhibit C, attached herein and incorporated by reference.*

98. Defendants again failed to respond to Mr. Khalil's email and declined to investigate or take action.

99. One day later, following months of systematic, targeted harassment and doxxing of Palestinian students that Defendants had deliberately failed to address and, in some instances,

enabled, and in conjunction with Defendants' direct discrimination, Mr. Khalil was illegally abducted by plainclothes ICE officers while at his Columbia-owned residential apartment building and subsequently detained for 104 days. Defendants' conduct directly contributed to the circumstances that culminated in Mr. Khalil's detention.

100. Defendants were aware that Columbia students and/or affiliates had been targeting Mr. Khalil and calling for his unlawful detainment prior to ICE arriving on Columbia's campus to remove Mr. Khalil.

101. The four ICE officers who arrested Mr. Khalil later testified to the fact that the order to arrest Mr. Khalil came from "high-level officials at ICE" who were notified that Secretary Rubio and/or the White House had a particular interest in Mr. Khalil's detainment. One officer admitted that he had never, in his 20 years as a Homeland Security employee, witnessed a lawful permanent citizen removed under similar circumstances.[15]

102. Throughout Mr. Khalil's detention and despite the fact that he was abducted from their own campus, Defendants never offered Mr. Khalil any support nor condemned his detainment. Upon information and belief, this response differed significantly from how Defendants responded to the ICE detainments of other Columbia students who were not Palestinian or who did not advocate for Palestine.[16]

### F. Following Mr. Khalil's illegal ICE abduction, Mr. Zubairi and members of PWG faced increased peer-on-peer harassment and targeted official policy harassment from Defendants.

---

[15] *Am. Ass'n of Univ. Professors v. Rubio*, No. 1:25-cv-10685-WGY,(D. Mass. Mar. 25, 2025); *Senior Officials Pushed for Arrests of Student Protestors, ICE Agents Testify*, Knight First Am. Inst. At Columbia Univ. (July 15, 2025), https://knightcolumbia.org/content/senior-officials-pushed-for-arrests-of-student-protesters-ice-agents-testify.

[16] Nadia Knoblauch and Dora Gao, *ICE arrests Columbia student, Shipman says agents lied to enter University-owned residence*, Columbia Daily Spectator, (Feb. 26, 2026), https://www.columbiaspectator.com/news/2026/02/26/dhs-agents-detain-columbia-student-after-entering-university-owned-residence-shipman-reports/("[University President] Shipman wrote in her email that the University is providing legal support to the student, marking the first time a University president has explicitly acknowledged providing legal support to a student detained by DHA in a University-wide email.")

103. After Mr. Khalil was detained by ICE, PWG members reasonably experienced an escalation of personal terror as they viewed Mr. Khalil's abduction and detention as the logical result of Defendants' deliberate indifference to the campaign of harassment and doxxing targeted toward Palestinian and perceived Palestinian students who advocated for Palestine.

104. On March 13, 2025, PWG planned an on-campus event at which students could gather and write letters to send to Mr. Khalil and his pregnant wife and share "Know Your Rights" resources to help protect each other from being similarly targeted by ICE. PWG provided SIPA with prior notice of this event and the accompanying photo installation it planned to display.

105. Without reason or justification, Defendants again deployed Public Safety to surveil the individuals attending the event simply because Defendants perceived PWG's members as Palestinian or non-citizens and therefore "violent." Upon information and belief, similar events that were not planned by Palestinian, perceived Palestinian, or non-citizen students were not subject to the same Public Safety Surveillance.

106. Then, during the event, a Columbia University employee approached the installation and, without explanation, began ripping down the photographs of Mr. Khalil in violation of the University Event Policy and University Rules of Conduct.

107. When PWG's members inquired into why Defendants had allowed the pictures of Mr. Khalil to be forcibly and publicly ripped down by a Columbia University staff member, they were told that the installation was an "unsanctioned display" and that any new materials PWG wished to post would require a dean's stamp (presumably Dean Yarhi-Milo's). PWG had not received prior notice of any such policy; and, upon information and belief, no such policy had ever been enforced against any other student group.

108. PWG members reasonably understood that they were once more being selectively

subjected to Defendants' contrived policies due to their Palestinian and perceived-Palestinian ancestry, non-citizen status, and Defendants' bigoted stereotypes.

109. Because Defendants had essentially rendered PWG unable to hold public events or utilize Columbia's facilities, PWG members began using a school-sanctioned WhatsApp group chat (the "SIPA WhatsApp Group Chat") to voice their concerns relating to ICE having kidnapped and detained Mr. Khalil. The SIPA WhatsApp Group Chat was maintained and monitored by Columbia employees and held open to all students enrolled at SIPA.

110. The concerns raised in the SIPA WhatsApp Group Chat by PWG members, that they may be similarly illegally abducted and held hostage, were met with further peer-on-peer harassment and antagonization.

111. For example, on March 24, 2025, a PWG board member, Member E, sent a message in the SIPA WhatsApp Group Chat notifying fellow SIPA students of a planned "Informational Picket." The picket was organized to protest Mr. Khalil's ongoing detention and to inform PWG members, and other non-citizen students, of their rights.

112. Mr. Zubairi, now PWG's President after Mr. Khalil's detainment, responded and urged his US-citizen peers to use their constitutional rights to protest state violence, such as the abduction, detention and deportation attempts of non-citizens. In response, another SIPA student not affiliated with PWG repeatedly accused Mr. Zubairi of being "aggressive" and advocating for "a violent process." This occurred in a group chat that SIPA administrators monitor, and, upon information and belief, SIPA was aware of the discrimination occurring in the group chat.

113. The accusation that Mr. Zubairi was aggressive and advocating for violence simply because he shared information about a peaceful picketing event fit a disturbing pattern; it was the same accusation made by Defendants when, to justify cancelling PWG's on-campus events, they

characterized PWG as posing a security threat, solely based on the fact that PWG members were Palestinian or perceived as sharing Arab ancestry.

114. In May 2025, Defendants, through OIE, brought a second meritless charge against PWG. This charge related to another PWG Instagram joint-post, this time displaying a video of a PWG member addressing Dean Yarhi-Milo at SIPA's graduation ceremony asking her to acknowledge Mr. Khalil's kidnapping from Columbia property. The complaint alleged that PWG's Instagram post created a hostile working environment for Dean Yarhi-Milo.

115. Upon information and belief, this was yet another example of Defendants official policy of using OIE to target and punish Palestinian, perceived-Palestinian, and non-citizen students for behavior that similar-situated non-Palestinian or perceived-Palestinian students engaged in with no issue.

116. Also in May 2025, several PWG members received a mass OIE "Policy Reminder" stating that each student had "sent multiple alleged discriminatory and/or harassing messages in the SIPA WhatsApp chat that may have created and/or contributed to a hostile environment" and putting the students on notice that "any future conduct may result in a Formal Investigation" under OIE Policy. Upon information and belief, only PWG members received this mass notice, and the notice was only sent in response to statements members had made discussing the ongoing genocide in Gaza in support of Palestine.

117. In order to attend the required OIE disciplinary interviews and hearings and dedicate the time required to respond to the latest charges brought against PWG, PWG members were forced to miss classes and other educational responsibilities, thereby damaging their academic performances, ruining their ability to focus on assignments and coursework, and inflicting additional emotional distress.

118. On July 17, 2025, OIE determined that, with respect to the February 2025 charge, the appropriate remedy would be to place PWG on probation through January 1, 2026.

119. Later that summer, a PWG member sent messages in the SIPA WhatsApp Group Chat wherein she celebrated Mr. Khalil's release from ICE detention, thanked her PWG community, and criticized Zionism. Consequently, Defendants singled out and removed this PWG member from the SIPA WhatsApp Group Chat.

120. When the PWG member sought clarification regarding her removal, SIPA's Student Association and OIE upheld her removal and denied her reentry. Upon information and belief, no other similarly-situated student had been denied access to a school sponsored resource like the SIPA WhatsApp Group Chat.

121. Such direct discrimination from Defendants reinforced PWG members' understanding that Defendants held immense animus towards, and therefore would not protect, Palestinian, perceived Palestinian, or non-citizen students and those individuals who advocated on their behalf.

122. Throughout the OIE disciplinary proceedings PWG members, including Plaintiffs, informed Defendants that the proceedings were discriminatory, baseless, and causing them significant harm. Defendants were therefore on notice that their behavior was impacting Plaintiffs ability to fully participate in or benefit from their education at Columbia.

123. On September 25, 2025, OIE determined that, with respect to the May 2025 charge, the appropriate remedy would be to suspend PWG indefinitely. OIE left open the possibility that PWG could petition for reinstatement upon taking several actions, including:

> (1) providing the full name of, and other personal information relating to, PWG's social media manager;
>
> (2) producing a list of all members with access to PWG's Instagram

account; and

(3) attending an in-person training session, despite the fact that multiple of PWG's non-citizen, Arab and/or Muslim-identifying members' feared for their physical safety while on Columbia's campus in light of ICE's presence there and Defendants refusal to protect certain of its students.

124. OIE further warned PWG that, should it fail to comply with any of these restrictions, Defendants may permanently rescind PWG's status as a recognized student organization at SIPA.

125. Such proposed remedies from the OIE violated the Anti-Discrimination and Discriminatory Harassment Policy which requires that any sanction imposed as part of the disciplinary proceeding be "fair and appropriate, given the facts of the particular case."

126. The OIE's proposed remedial measures were designed to target PWG's individual members, and therefore inappropriate given the facts of the case. Complying with the OIE's measures would essentially mean PWG doxxed its own members, many of whom had already suffered targeted harassment and doxxing and who were from marginalized groups and/or non-citizens.

127. Upon information and belief, not only were no other similarly-situated non-perceived-Palestinian student groups subject to similar baseless OIE accusations, no other group whose members were not perceived to be Palestinian was asked to doxx its own members or provide Defendants with members' personal information.

128. PWG timely appealed both OIE sanctioning decisions.

129. On October 27, 2025, OIE investigators and reviewing Columbia University faculty members denied PWG's appeal in its entirety.

130. Two days later, on October 29, 2025, Dean Yarhi-Milo publicly stated that pro-

Palestine and/or anti-Zionist beliefs are "a problem" on campus that need to be dealt by employing mechanisms like the OIE.[17] Dean Yarhi-Milo stated that she was proud of how Defendants treated pro-Palestine student protestors since October 7, 2023, and of how the OIE had been utilized to levy allegations against and launch investigations into students expressing pro-Palestine and/or anti-Zionist viewpoints.

131. On December 12, 2025, OIE sent a letter to PWG stating that it had been made aware that PWG was posting to its Instagram account and warning that any posting or reposting on PWG's Instagram page was a violation of the sanctioning decision and could lead to permanent de-recognition. However, the sanctioning determination did not include a broad ban on any posting to PWG's Instagram account.

132. In response to PWG's request for clarification, OIE again added new conditions to the sanctioning decision, now stating that PWG must petition to "OIE for review in consultation with Student Affairs" for consideration of reinstatement, instead of directly to the Office of Student Affairs as had been previously communicated. Once more, Defendants were violating their own Anti-Discrimination and Harassment Policy and Procedures and applying them disparately to Plaintiffs because of their Palestinian and perceived Palestinian ancestry or non-citizen status.

133. Defendants repeated, public singling out and punishment of PWG and its members for entirely peaceful conduct and criticisms, while simultaneously refusing to even investigate threats of violence being made against Palestinian or perceived Palestinian students, was intentional discrimination that caused PWG members to fear for their safety at Columbia.

134. Defendants' failure to protect Mr. Khalil, its subsequent indifference to his detention, and its ongoing enabling of harassment against PWG members restricted PWG

---

[17] Unholy Podcast, *Unholy Live NYC: A conversation with Hillary Rodham Clinton and Dr. Keren Yarhi-Milo*, YouTube (Oct. 30, 2025), https://www.youtube.com/watch?v=PdPskPBd_78.

members' ability to attend classes and other on-campus events, thereby depriving these individuals of the educational opportunities to which they were contractually entitled.

135. Defendants' recurring failure to take prompt, meaningful action in response to the doxxing and harassment of PWG's members also caused the group's members to experience serious mental anguish, as they reasonably feared being unprotected on SIPA's campus.

136. PWG remains forbidden by Defendants from hosting or assisting with any official or unofficial group activities; prohibited from using Columbia's name in any of PWG's planning and/or advertising materials; prohibited from using Columbia's facilities; and restricted from all financial assistance from Columbia.

137. Because of their ongoing animus towards Palestinian and perceived Palestinian students, Defendants used the OIE process in a deliberate attempt to ensure PWG would be indefinitely disbanded at SIPA by purposefully changing the conditions PWG had to meet for reinstatement.

138. To date, several current SIPA students have stated that they wish to join PWG and serve on its governance board but would decline to do so unless remedial measures were put in place to remedy the hostile environment PWG had operated under at SIPA prior to its suspension.

139. PWG members, including Plaintiffs Mr. Khailil and Mr. Zubairi, were aware of the discrimination endured by other individual members as well as aware of the discrimination to which PWG itself was subjected.

## II. Additional Allegations Relating to Individual Plaintiffs

### A. Plaintiff Mahmoud Khalil

140. Plaintiff Mahmoud Khalil repeats and realleges the allegations of the preceding paragraphs as though fully set forth herein.

141. While completing his Master's Degree program at Columbia University, Mr. Khalil

worked to raise awareness about human rights in Palestine. In addition to being elected President of PWG in Spring 2023, he co-founded the Palestinian Student Union at Columbia – Dar.

142. As a representative of Palestinian students at Columbia, Mr. Khalil repeatedly met with and emailed Defendants, pleading for their support and intervention as Palestinian students, including himself, faced increasing harassment, threats, and discrimination on campus that made them feel unsafe. Mr. Khalil repeatedly brought these concerns directly to Defendants and sought their assistance in protecting the Palestinian community, but Defendants failed to provide the support or protection he sought.

143. As stated by Mr. Khalil to Columbia University's then-president Claire Shipman and other Columbia University administrators on April 8, 2024:

> Palestinians not only feel unheard but also alienated and attacked by the administration. I now rarely go to SIPA. ***What does it feel like to be a Palestinian at Columbia? It feels like I am constantly worried about my safety on campus***, fearing being called names at Low Steps, or receiving another unsubstantiated email from administration, which serves only to intimidate and threaten. Since last semester, ***I haven't gained any meaningful education at Columbia.*** I now only complete assignments to pass, not to learn, and this deeply saddens me coming from a refugee camp to Columbia to fulfill my dream of getting a first-class education, but unfortunately, it has been far from first class.

144. Because Mr. Khalil was well respected by both faculty and students during his time at SIPA, he was selected to serve as a mediator between students and Defendants regarding the Gaza Solidarity Encampment established on April 17, 2024. Assuming this role elevated Mr. Khalil to a public face of the protest movement.

145. Although Mr. Khalil was assured in writing that he would not face disciplinary action for his role as a negotiator, Defendants almost immediately began to retaliate against Mr. Khalil for opposing the discrimination of Palestinians and filing reports of such harassment with

Columbia. Defendants levied numerous unfounded allegations of misconduct against him because of his Palestinian identity.

146. For example, on or around April 30, 2024, Defendants abruptly suspended Mr. Khalil, determining that he posed a "security risk" purportedly due to his Palestinian ancestry and status on campus as a representative of other Palestinian students. Consequently, Defendants denied Mr. Khalil access to Columbia University's campus and barred him from participating in all Columbia classes, academic activities, and extracurriculars.

147. After news of Mr. Khalil's suspension was reported and condemned, Defendants lifted the suspension. However, Defendants refused to publicly correct factual inaccuracies surrounding its suspension; and, as a result, those false allegations were cited by the U.S. Government in its attacks against him.

148. When Mr. Khalil was allowed to return to SIPA, Defendants continued to harass and treat him with hostility due to his Palestinian national origin.

149. For example, between late 2024 and early 2025, Defendants, through OIE, repeatedly launched pretextual, meritless allegations of antisemitism against Mr. Khalil. These allegations were premised solely on the fact that he is a Palestinian man and in retaliation for his reports of Palestinian harassment at Columbia.

150. For example, OIE accused Mr. Khalil of harassing Dean Yarhi-Milo when he criticized her public decision to invite Naftali Bennet on to campus and wrote in the SIPA WhatsApp Group Chat that "*SIPA's genocidal dean refuses to give Khalidi a platform at SIPA and prefers to invite warmongers.*" Once more, Defendants were engaging in an official policy of punishing Palestinian students who advocated for Palestine and retaliating against those individuals, like Mr. Khalil, who reported such instances of harassment.

151. As a result of Defendants' numerous unfounded and retaliatory OIE allegations, Mr. Khalil was subjected to a lengthy and pervasive OIE process that caused him to postpone his job search, miss classes, and withdraw from participating in other on-campus activities and forced him to retain counsel to represent him before OIE.

152. Defendants also placed a hold and notation on Mr. Khalil's transcript prior to issuing any findings of wrongdoing in violation of Columbia's own Anti-Discrimination and Discriminatory Harassment Policy. Only after a lengthy process requiring intervention of retained counsel did OIE lift the hold on Mr. Khalil's transcript.

153. As detailed above, Mr. Khalil was subjected to persistent, ongoing harassment throughout this time due to his Palestinian national origin and pro-Palestine advocacy.

154. On February 27, 2025, Mr. Khalil submitted an OIE report notifying Defendants of ongoing targeted harassment and discrimination. Upon information and belief, no action was taken by OIE to investigate or discipline the appropriate individuals.

155. On March 6, 2025, Mr. Khalil submitted to OIE multiple reports describing the discrimination, doxxing, and harassment he had faced at Columbia University, including harassment by Public Safety and other university employees. Upon information and belief, no action was taken by OIE to investigate the appropriate individuals.

156. In that report, Mr. Khalil also included the screenshots of social media posts made by Professor Davidai and Mr. Lederer calling for his deportation, which he described as "*a broader pattern of targeted harassment against [him] as a Palestinian, designed to intimidate, silence, and endanger [him].*" *See Exhibit D attached hereto and incorporated by reference* Upon information and belief, Defendants made no effort to investigate or discipline these Columbia community members doxxing Mr. Khalil.

157. That same day, while Mr. Khalil was on campus, Public Safety singled him out without cause and questioned why he was present there. When asked why Mr. Khalil had been approached and questioned about how he had gained access to campus, Public Safety was unable to provide any explanation. Nonetheless, videos of the interaction subsequently circulated online and were used by Columbia affiliates to smear Mr. Khalil, including by calling for his arrest and deportation. Mr. Khalil reasonably interpreted this action as an attempt to target and harass him because of his identity as a Palestinian man.

158. Mr. Khalil reported the incident where he was singled and out and discriminated against to OIE and other Columbia University officials, alongside a fellow PWG member who witnessed the event. Upon information and belief, in violation of Defendants' own policies and procedures, OIE took no disciplinary action against the perpetrator, and Defendants failed to clarify or correct the erroneous public reporting of this incident.

159. As detailed above, Mr. Khalil emailed Dr. Armstrong and other Columbia leadership on March 7, 2025, expressing his personal fear and urging Columbia to take action to protect him and other Palestinian and non-citizen students.

160. As detailed above, on March 8, 2025, plain clothed ICE officers unlawfully entered the vestibule of Mr. Khalil's university apartment building and abducted him without a warrant in front of his then-pregnant wife. He was transported to immigration detention in Jena, Louisiana within hours, nearly 1,300 miles from family and counsel.

161. Defendants again refused to accurately report the circumstances of this event and or clarify incorrect reporting regarding the nature of Mr. Khalil's role as a negotiator and mediator during the protests, allowing the false narrative about his conduct and role to persist.

162. Defendants' response to Mr. Khalil's unlawful detainment and abduction was

notably different from how it handled a Spring 2026 incident, during which ICE had similarly entered Columbia University's campus and impermissibly arrested another international student who was not Palestinian.[18] In that incident, Defendants provided the detained student legal support and pledged to deploy additional Public Safety officers to residential buildings to deter ICE detainments.

163. Mr. Khalil was released from ICE detention on bail on June 20, 2025.

164. During the Fall 2025 semester, Mr. Khalil requested a guest pass to visit Columbia University's campus in part to return a library book. Although guest passes are routinely granted to alumni like Mr. Khalil seeking to visit the University's campus. Defendants rejected Mr. Khalil's request without providing any legitimate justification. Defendants have since blocked his library account for an outstanding fee of $100.

165. Also during the Fall 2025 semester, a group of Columbia University professors sought to have Mr. Khalil speak to their classes. Defendants threatened the professors and stated that allowing Mr. Khalil to speak to their classes posed a risk of creating a "hostile environment."

166. That same semester, a group of Columbia professors also sought to have Mr. Khalil speak at a screening of *The Encampments*, a documentary in which Mr. Khalil is one of the film's protagonists. Defendants again refused to permit Mr. Khalil to enter campus to attend the event, without providing any legitimate justification for their decision.

167. Time and again, Mr. Khalil, a Columbia University tuition-paying student, turned to Defendants to uphold their end of their educational contract to no avail. Mr. Khalil was legally

[18] Nadia Knoblauch and Dora Gao, *ICE arrests Columbia student, Shipman says agents lied to enter University-owned residence*, Columbia Daily Spectator, (Feb. 26, 2026), https://www.columbiaspectator.com/news/2026/02/26/dhs-agents-detain-columbia-student-after-entering-university-owned-residence-shipman-reports/("[University President] Shipman wrote in her email that the University is providing legal support to the student, marking the first time a University president has explicitly acknowledged providing legal support to a student detained by DHA in a University-wide email.")

entitled to a learning environment free from harassment and hostility. Defendants stripped him of these rights.

168. Defendants – due to both their animus towards Palestinian individuals and their frustration with Mr. Khalil repeatedly reporting national origin and ancestry-based harassment he had been subjected to at SIPA, as was his right under Title VI – retaliated against Mr. Khalil by deliberately failing to investigate the aforementioned instances of doxxing and harassment instigated by a fellow Columbia University professor and student. Such actions cost Mr. Khalil his freedom and, consequently, his educational benefit.

169. Defendants continue to deny Mr. Khalil the benefits to which he is entitled as a Columbia alumnus; including, but not limited to, restricting his access to Columbia's campus.

170. Defendants' official policy of deliberate indifference to the harassment of Palestinian students on Columbia's campus, and their subsequent retaliation against Mr. Khalil for engaging in protected behavior immeasurable, negatively impacted his wellbeing. In addition to being separated from his family and missing the birth of his first child, Mr. Khalil developed severe anxiety, hypervigilance, insomnia, and lived in constant fear for his safety. He continues to feel the negative mental impact of his time at SIPA and the harassment he experienced there.

**B. Plaintiff Mohammad Ibrahim Zubairi**

171. Plaintiff Mohammad Ibrahim Zubairi repeats and realleges the allegations of the preceding paragraphs as though fully set forth herein.

172. Mr. Zubairi is a Pakistani man who was enrolled as a student at SIPA from August 2024 to May 2026. He became president of PWG shortly after Mr. Khalil's detention and continued to serve in that role through PWG's suspension and to the present.

173. As president of PWG, Mr. Zubairi became one of the most visible pro-Palestine

student advocates at SIPA, such that many perceived him to be Palestinian himself.

174. Dean Yarhi-Milo herself once asked Mr. Zubairi which part of Palestine he was from when speaking with him at a student officer training event. She was surprised, confused, and even repelled by his choice to affiliate himself with Palestine when she learned that he is not Palestinian.

175. As discussed above, on March 24, 2025, a PWG member (identified below as PWG Member E) sent a message in the SIPA WhatsApp Group Chat wherein she notified fellow SIPA students of an Informational Picket that PWG had organized to protest Mr. Khalil's ongoing detention and inform similarly at-risk individuals of their rights. Mr. Zubairi joined in on conversations that followed and, in response, a non-PWG affiliated SIPA student repeatedly accused Mr. Zubairi of being aggressive. In a message directed at Mr. Zubairi, that student stated, "As a longtime resident of this city and lifelong citizen of this country, please check your violence at the door."

176. Given that ICE had recently illegally detained and kidnapped PWG's former president, Mr. Khalil, Mr. Zubairi felt threatened by this fellow SIPA student emphasizing his immigration status while baselessly but publicly accusing him of being an aggressive and violent person.

177. In the aftermath of this and several other hostile incidents with SIPA affiliates, Mr. Zubairi altered the course of his SIPA education to avoid the hostile environment described herein. He opted for electives outside of SIPA so as to minimize interactions with SIPA faculty, SIPA OSA staff and the wider SIPA cohort as he had been harassed for advocating on behalf of his Palestinian friend and colleague.

178. Likewise, in Spring 2026, Mr. Zubairi requested an exemption from the

international travel component of his Capstone Project out of fear for his physical safety and immigration status. The Capstone Project is an integral part of the SIPA curriculum and a benefit to which his tuition entitled him.

179. In addition to the significant toll on his educational benefits, Mr. Zubairi suffers from Generalized Anxiety Disorder and Panic Disorder requiring medication, and has experienced acute episodes of anxiety and panic attacks as a result of the hostile treatment he experienced at SIPA because of his perceived Palestinian ancestry and his affiliation with Palestinian advocacy.

## III. Additional Allegations Relating to Non-Party PWG Members

### A. PWG Member A: Tariq Kenney-Shawa

180. Between Fall 2020 and May 2022, PWG Member A, Tariq Kenney-Shawa, was a student at Columbia University. Mr. Kenney-Shawa is a Palestinian-American man.

181. From September 2020 through present, Mr. Kenney-Shawa has been a PWG member.

182. In March 2022, while a PWG board member, Mr. Kenney-Shawa published Instagram stories relating to his experience during PalTrek. Another SIPA student reported Mr. Kenney-Shawa's Instagram activity to a SIPA Professor, alleging that Mr. Kenney-Shawa's description of his own experience constituted bullying.

183. On March 31, 2022, Defendants compelled Mr. Kenney-Shawa to meet with them to discuss the complaint. Defendants did not disclose, nor otherwise provide, Mr. Kenney-Shawa with notice of, the meeting's specific purpose. Upon learning about the substance of the complaint, Mr. Kenney-Shawa expressed concern that he was being intentionally singled out as a Palestinian student because sharing his PalTrek experience was in no way harmful to other students and several other students had similarly posted about their experiences while

attending iTrek and PalTrek without issue. Upon information and belief, other non-Palestinian students who shared their experiences were not subject to similar complaints or allegations.

184. As a result of Defendants' meritless investigation, Mr. Kenney-Shawa became distracted and mentally distraught. Consequently, Mr. Kenney-Shawa withdrew from on-campus activities due to the fear that he would be unjustly punished for misconduct that he did not commit. Thus, Defendants' actions caused Mr. Kenney-Shawa to feel excluded at SIPA because of his Palestinian identity and deprived Mr. Kenney-Shawa of the full benefit of his educational experience.

185. In April 2022, Mr. Kenney-Shawa observed a first-year PWG member who had participated in PalTrek being verbally harassed by a SIPA student for wearing a traditional Palestinian *keffiyeh*, explicitly calling the *keffiyeh* "what terrorists wear."

186. Around this same time, Mr. Kenney-Shawa also witnessed a Jewish SIPA student verbally harasses a different PWG member, making an inflammatory and baseless blanket statement that Palestinians would "shoot her if she [told] them she's Jewish."

187. Mr. Kenney-Shawa personally reported these incidents of harassment to SIPA's Office of Student Affairs. A complaint was also lodged with Columbia's Ombuds Office, which aims to "promote civility, mutual respect and ethical conduct, and to identify ways to prevent disruptive conflict by alerting the administration to policy issues[.]"[19] Upon information and belief, in violation of their own policies and procedures, no further action was taken by Defendants.

188. Together, these experiences, and Defendants' deliberate inaction, left Mr. Kenney-Shawa with the sense that his Palestinian identity and advocacy for the human rights of his own people were and would continue to be uniquely stigmatized, unwelcomed and inadequately

[19] *About the Ombuds*, Columbia, Ombuds Office, https://ombuds.columbia.edu/ (last visited September 11, 2026).

protected at SIPA.

**B. PWG Member B: Jasmine Dakhil Sarryeh-Jemersic**

189. Ms. Jasmine Sarryeh-Jemersic, PWG Member B, is a Palestinian woman.

190. Between 2019 and 2026, Ms. Jasmine Sarryeh-Jemersic was a Columbia University student. Beginning in January 2023, Ms. Sarryeh-Jemersic served as a PWG board member.

191. Following October 7, 2023, Ms. Sarryeh-Jemersic, in her capacity as a PWG board member, sent multiple emails to Dean Yarhi-Milo asking that she meet with her and other Palestinian students, including other PWG members, to discuss Defendants' response to the recent escalation in perceived national origin, ancestry, and citizenship-based harassment that had been taking place at SIPA. Neither Dean Yarhi-Milo nor any other member of SIPA leadership responded to these requests.

192. On October 18, 2023, Ms. Sarryeh-Jemersic was doxxed by Canary Mission via the publishing of a website listing Ms. Sarryeh-Jemersic's full name, photograph, and former employers, and including links to her social media pages. The doxxing website remains active.

193. Ms. Sarryeh-Jemersic immediately reported, via email, the creation of the doxxing website to Defendants, explaining that these circumstances made her fear for her physical safety both on and off SIPA's campus. Because of her safety concerns, Ms. Sarryeh-Jemersic experienced serious emotional distress and was nervous to attend classes. Nonetheless, Defendants failed to take any action in response to Ms. Sarryeh-Jemersic's report.

194. On November 30, 2023, Columbia University hosted a public conversation between Dean Yarhi-Milo and the dean of Princeton University's School of Public and International Affairs, Amaney Jamal. During this event, Ms. Sarryeh-Jemersic asked Dean Yarhi-Milo about why she had declined to respond to her emails. In response, Dean Yarhi-Milo began yelling at Ms.

Sarryeh-Jemersic in front of other SIPA students and faculty.

195. Eventually, Dean Yarhi-Milo met with Ms. Sarryeh-Jemersic to discuss the doxxing of PWG members, including herself, that had been taking place at Columbia. During this meeting, Ms. Sarryeh-Jemersic raised the question of whether a SIPA affiliate had leaked the photos displayed on the doxxing truck that had been circling Columbia's campus. Rather than acknowledging the seriousness of Ms. Sarryeh-Jemersic concerns, Dean Yarhi-Milo angrily dismissed Ms. Sarryeh-Jemersic's concerns as harmful to campus culture and declined to investigate who had accessed PWG's CampusGroups page.

196. When Ms. Sarryeh-Jemersic subsequently asked Dean Yarhi-Milo whether SIPA leadership had even attempted to investigate how PWG members' photos, which were the same as those used on the password-protected CampusGroups platform, had been leaked to the doxxing truck, Dean Yarhi-Milo grew incredibly confrontational, exclaiming, "How dare you, imply someone from the school would be associated with this!"

197. Again, Dean Yarhi-Milo refused to investigate how PWG members' photos were leaked from CampusGroups, intentionally disregarding the valid safety concerns raised by PWG members, including, but not limited to Ms. Sarryeh-Jemersic, because of her animus towards Palestinian, perceived-Palestinian and non-citizen students, as well as those associated with Palestinians through PWG

198. Because Ms. Sarryeh-Jemersic had been doxxed and left unprotected by Defendants, who refused to investigate the incident and even publicly antagonized and vilified her, Ms. Sarryeh-Jemersic experienced extreme emotional distress, struggling to attend classes and to complete her coursework. Thus, both Defendants' affirmative actions and their intentional failure to act deprived Ms. Sarryeh-Jemersic of the full benefit of her education at Columbia.

### C. PWG Member C: Bhavana Bellamkonda

199. Between August 2022 and May 2024, Ms. Bellamkonda, PWG Member C, was a Columbia University student. Ms. Bellamkonda became a PWG member in January 2023.

200. Ms. Bellamkonda was one of the PWG members who, beginning in October 2023, had her full name and CampusGroups photograph displayed on the doxxing truck next to the words "Columbia's Leading Antisemites."

201. Around the same time the doxxing truck appeared, Ms. Bellamkonda was doxxed online by Accuracy in Media ("AIM"), a right-wing nonprofit group and the same organization responsible for the doxxing trucks. AIM purchased the domain of a website matching Ms. Bellamkonda's full name and published Ms. Bellamkonda's full name, photograph, and details about the school she attended. The doxxing website remains active.

202. Ms. Bellamkonda immediately reported both her information appearing on the doxxing truck and the publishing of the doxxing website to Defendants.

203. Defendants failed to take any meaningful action to investigate or otherwise address the serious safety issues posed by the doxxing truck or the doxxing website and were deliberately indifferent to the severe trauma these incidents caused Ms. Bellamkonda.

204. During the Spring 2024 semester, Ms. Bellamkonda enrolled in a SIPA course titled "Terrorism and Counter Terrorism." When attending this class, Ms. Bellamkonda regularly wore a keffiyeh as a show of solidarity with the Palestinian people.

205. On February 19, 2024, during the Terrorism and Counter Terrorism course, a non-Arab student enrolled in the same class, Sarah Cohen, referred to Ms. Bellamkonda as "our resident terrorist" and insinuated that Ms. Bellamkonda had enrolled in the class to provide an "expert opinion" on terrorism — a statement clearly made in direct reference to Ms. Bellamkonda's pro-

Palestinian advocacy and her being perceived as Arab.

206. On February 20, 2024, Ms. Bellamkonda reported this remark to the Center for Student Success and Intervention ("CSSI"). CSSI took approximately two months to initially follow up on the report. Then, on June 18, 2024, Ms. Bellamkonda unexpectedly received a notice from CSSI that her report had been resolved.

207. Upon information and belief, and in violation of their own policies, Defendants did not discipline or reprimand Ms. Cohen for her comments. Instead, Defendants rewarded Ms. Cohen by appointing her as a scholar and speechwriter to the distinguished SIPA IGP, which was co-led by Dean Yarhi-Milo.

208. As a result of these incidents and Defendants' deliberate indifference to the severity of the doxxing harassment Ms. Bellamkonda was subjected to, Ms. Bellamkonda suffered severe emotional distress that made it difficult for her to attend classes, depriving her of the full benefit of her education.

**D. PWG Member D: Tasfia Arshad**

209. Ms. Arshad was a Columbia University student from Fall 2022 to Spring 2024. She is a Muslim woman and became a PWG member during the Spring 2023 semester.

210. Ms. Arshad was doxxed online by AIM, which purchased the domain of a website matching her full name, and on which Ms. Arshad's name, photograph, and details about the school she attended were published. The doxxing website remains active.

211. Ms. Arshad immediately reported the doxxing website to Defendants, explaining how these circumstances understandably made her fear for her physical safety both on and off SIPA's campus, thereby causing her serious emotional distress and making her nervous to attend classes.

212. Defendants failed to take any meaningful action to investigate or otherwise address the serious safety issues posed by the doxxing website and remained deliberately indifferent to the severe trauma these incidents caused Ms. Arshad.

213. Following this incident, Ms. Arshad no longer felt safe at SIPA or on any of Columbia's facilities. She had her partner or sister pick her up any time she attended classes at SIPA because she believed that, were she spotted leaving alone, she was likely to be followed and subsequently harmed. Ms. Arshad's legitimate concerns and anxiety caused her to experience trouble sleeping, rendered her unable to travel alone due to fear and anxiety, and caused her to experience overwhelm and crying spells, particularly while on SIPA's campus.

214. Due to these issues and Defendants' failure to take action to protect Ms. Arshad, she stopped attending classes at SIPA in Spring 2024.

**E. PWG Member E: Anonymous**

215. Between August 2023 through May 2025, PWG Member E was a Columbia University student. PWG Member E joined PWG during the Spring 2024 semester.

216. Member E is currently expelled from Columbia University in relation to her Pro-Palestine advocacy and affiliation.

217. Following Mr. Khalil's detainment, Member E placed pro-Palestine stickers, including ones that simply read "Free Mahmoud," around SIPA's campus.

218. In April 2025, while Member E was in Louisiana supporting Mr. Khalil at one of his immigration hearings, CSSI contacted Member E alleging that she had violated University policy by "placing stickers in numerous locations within SIPA without authorization."

219. On April 13, 2025, Member E reached out to CSSI requesting an extension for her disciplinary hearing for medical purposes. Specifically, Member E was experiencing severe

anxiety and trauma due to Mr. Khalil's detainment. CSSI denied Member E's request without further explanation.

220. During the hearing, CSSI provoked Member E, causing her to suffer an emotional breakdown and leave in tears.

221. Upon information and belief, students frequently posted non-authorized stickers around SIPA's campus with no consequence, and Defendants' selective enforcement against Member E was intended to retaliate against her on the basis of her advocacy for Mr. Khalil.

222. Additionally, Defendants subjected Member E to their official policy when she received an OIE charge for an incident during which she lawfully recorded Dean Yarhi-Milo while questioning why she decided to invite and host Mr. Bennett in the midst of the student protests against Israel. Such conduct from Defendants was an explicit choice to harass and retaliate against Member E.

223. On June 16, 2025, Member E was found to have violated OIE policy and sanctioned with a one-year academic suspension. The June 16, 2025 sanctioning letter stated, "It was . . . alleged that you targeted Individual #1 on the basis of the individual's actual or perceived membership in, or associated with a Protected Class." Individual #1 referred to Dean Yarhi-Milo.

224. The OIE disciplinary measures brought against Member E again demonstrate how Defendants have weaponized OIE to retaliate against PWG members due to their association with Palestinian individuals.

225. On July 2, 2025, Member E was again subjected to a meritless OIE allegation of discrimination for sending pro-Palestine and anti-Zionist messages in the SIPA WhatsApp Group Chat on June 20, 2025, the day of Mr. Khalil's release from ICE detention.

226. On February 18, 2026, Defendants concluded their OIE investigation and expelled

PWG Member E for her June 20, 2025, SIPA WhatsApp Group Chat messages.

227. As a result of Defendants' targeted retaliation against Member E, she has suffered severe, debilitating panic attacks and other ongoing emotional distress.

**F. PWG Member F: Anonymous**

228. PWG Member F was a Columbia University student between Fall 2022 and May 2024. She joined PWG in 2023.

229. Beginning in October 2023, Member F's full name and CampusGroups photograph were displayed on the doxxing truck next to the words "Columbia's Leading Antisemites." The photograph displayed on the doxxing truck was one only known to be uploaded to the CampusGroups directory.

230. Member F immediately reported the doxxing truck to Defendants, explaining how the truck understandably made her fearful for her safety both on and off SIPA's campus, thereby causing her serious emotional distress and making her nervous to attend classes or otherwise use Columbia's facilities.

231. Defendants failed to take any meaningful action to investigate or otherwise address the serious safety issues posed by the doxxing truck and were deliberately indifferent to the severe trauma these incidents caused Member F.

**G. PWG Member G: Carly Shaffer**

232. Ms. Shaffer was a Columbia University student between Fall 2023 and May 2025.

233. Ms. Shaffer joined PWG during the Spring 2024 semester and served as the PWG representative during the OIE proceedings for the allegations brought against PWG.

234. As a result of her affiliation with Mr. Khalil and her leadership with PWG, Ms. Shaffer suffered significant harassment from other Columbia students and faculty, including her

exclusion from SIPA Jewish student group chats, interrogation by multiple professors, harassment in Columbia Senate meetings, and unconsented recording in class. Ms. Shaffer also missed classes and a midterm exam because of the harassment she faced at Columbia.

235. As a result of harassment, the pervasive hostile environment she endured at SIPA, and Defendants' deliberate indifference to those events, Ms. Shaffer suffered from anxiety and endured related nightmares to such severity that she was eventually hospitalized.

**H. PWG Member H: Danial Saiyid**

236. Mr. Saiyid was a Columbia University student between January 2023 and December 2023. Mr. Saiyid is a Muslim man and has been a member of PWG since January 2023.

237. In October 2023, Mr. Saiyid was doxxed online by AIM, who purchased the domain of a website matching his full name and, on this website, published his name and the name of the school he attended. The doxxing website remains active.

238. Unlike other PWG Members, Mr. Saiyid's photograph did not appear alongside his name on doxxing website, ostensibly because he did not have a photograph of himself uploaded to CampusGroups.

239. Mr. Saiyid immediately reported the doxxing website to Defendants, explaining how these circumstances understandably made him fearful for his safety both on and off SIPA's campus, thereby causing him serious emotional distress and making him nervous to attend classes or visit Columbia's facilities.

240. Defendants failed to take any meaningful action to investigate or otherwise address the serious safety issues posed by the doxxing website and were deliberately indifferent to the severe trauma these incidents caused Mr. Saiyid.

241. Defendants' failure to act, and the harassment of perceived Arab individuals that

pursued, caused Mr. Saiyid to fear for his physical safety and future job prospects. The harassment distracted him from his classes and kept him from enjoying the full benefit of his educational experience.

**I. PWG Member I: Anonymous**

242. PWG Member I was a Columbia University student between September 2022 through May 2024. Member I joined PWG in January 2023.

243. In October 2023, Member I was doxxed online by AIM, which purchased the domain of a website matching her full name and, on this website, published her name, photograph, and the name of the school she attended. The doxxing website remains active and, because of its domain name, appears whenever Member I's name is entered into a search engine, such as Google.

244. Member I immediately reported the doxxing website to Defendants, explaining how these circumstances understandably made her fearful for her safety both on and off SIPA's campus, thereby causing her serious emotional distress and making her nervous to attend classes.

245. Defendants failed to take any meaningful action to investigate or otherwise address the serious safety issues posed by the doxxing website and was deliberately indifferent to the severe trauma these incidents caused Member I.

**J. PWG Member J: Miriam Yousaf**

246. Ms. Yousaf is a Pakistani-American woman who was a student at Columbia and SIPA from September 2024 through May 2026. Ms. Yousaf joined PWG in October 2024 and has served on the board since June 2025.

247. On November 5, 2025, Ms. Yousaf tried to register Mr. Khalil as a guest for entry to campus. Ms. Yousaf filled out the form stating accurate timing, contact information, and purpose of visit. Upon submission, she received an error message reading, "Your request could

not be completed. Please contact Public Safety."

248. Ms. Yousaf's request to register Mr. Khalil as a guest was denied in retaliation for her and Mr. Khalil's pro-Palestine advocacy, perceived shared Arab and/or Muslim ancestry, and perceived immigrant and non-citizen status.

249. Ms. Yousaf has felt targeted and fearful for her safety at SIPA as a result of her affiliation with Palestine and ethnicity. The hostile environment that Defendants facilitated caused Ms. Yousaf such intense mental anguish that it was difficult to focus on her coursework, depriving her of the ability to enjoy the full benefit of her education at Columbia.

**K. PWG Member K: Phillip Crane**

250. Mr. Crane was a student at Columbia and SIPA from August 2022 through May 2024. Mr. Crane joined PWG in Fall 2022 and, at times, served as its secretary.

251. Mr. Crane was doxxed on a website created by AIM. The website is still active and features a pre-filled email form to send to leaders of Mr. Crane's current place of employment, Virginia Military Institute, to call for his termination.

252. Mr. Crane's full name and photograph also appeared on the doxxing truck. The doxxing truck displayed a link to a website with the same pre-filled email to Virginia Military Institute, Mr. Crane's current employer.

253. Mr. Crane immediately reported both the doxxing truck and the doxxing website to Defendants.

254. Defendants failed to take any meaningful action to investigate or otherwise address the serious safety issues posed by the doxxing truck or the doxxing website and were deliberately indifferent to the severe trauma and threat to future employment these incidents caused Mr. Crane.

**L. PWG Member L: Anonymous**

255. PWG Member L was a student at SIPA and Columbia from Fall 2022 through May 2025. Member L has been a member of PWG since Fall 2022 and at times served as co-president.

256. As a result of her PWG membership and visible pro-Palestine advocacy and affiliation, Member L was often perceived as Palestinian.

257. Member L experienced multiple instances of harassment and exclusion from campus activities as a result of her membership with PWG and perceived Palestinian ancestry as described above, including an altercation between Dean Yarhi-Milo and two other PWG members and retaliation against PWG members following Mr. Khalil's detainment.

258. As a result of Defendants' deliberate indifference towards the on-campus harassment of and retaliation against PWG members, Member L suffered anxiety that interfered with her ability to attend class and led her to attend classes virtually.

**M. PWG Member M: Lucas Brooks**

259. Mr. Brooks was a student at SIPA from Fall 2023 through Spring 2025. He joined PWG in Fall 2023 and served on the board in Spring 2025.

260. Mr. Brooks served alongside Ms. Shaffer as the PWG representative for OIE disciplinary proceedings with OIE.

261. Mr. Brooks reported Public Safety's March 6, 2025 harassment of Mr. Khalil to OIE on March 24, 2025.

262. Defendants failed to respond to Mr. Brooks or otherwise investigate his allegations.

263. As a result of Defendants' deliberate indifference towards the on-campus harassment of and retaliation against PWG members, Mr. Brooks was denied the full benefit of his education, including but not limited to, his inability to focus on his coursework or participate in PWG's advocacy efforts.

### N. PWG Member N: Anonymous

264. PWG Member N was a student at SIPA from September 2023 through May 2025 and served as a Teaching Assistant ("TA") for a SIPA human rights course. Member N was known to be pro-Palestinian and became a PWG member in 2025.

265. In her role as a TA, Member N was witness and personally subject to a hostile educational environment for Palestinian and perceived-Palestinian students. This experience affected her ability to TA and harmed her educational experience as a TA.

266. Specifically, on the first day of the course for which Member N was a TA, a message sent in the SIPA WhatsApp Group Chat was brought up in class which read: "I support genocide because I assert Israel has a right to defend itself? Ok [pink heart emoji]." It was sent during a discussion of war crimes being committed by the Israeli military. Member N found this comment expressly inhumane and threatening.

267. Member N subsequently learned that another SIPA student and PWG member, Ms. Shaffer, was dropping the course after learning that an Israeli student in the class had recorded her while she was speaking in support of Palestine.

268. From then on, Member N felt unsafe speaking freely in the human rights course, which negatively impacted her ability to perform her job and complete her degree requirements.

269. Member N was also selected to serve as an Orientation Leader for incoming students at SIPA. On August 23, 2024, Member N attended Columbia's required Title VI training, conducted in person by Joseph Greenwell of University Life. Member N had previously completed Columbia's required training in 2023 while serving as a Research Assistant.

270. Member N immediately noticed that the 2024 training had been substantially changed from the prior year and that its scenarios were specifically directed toward the types of

pro-Palestinian speech and advocacy occurring on campus following October 7, 2023.

271. Member N understood from the subject matter and the particular examples in the training that the purported examples of "harassment" portrayed were directly tailored to the pro-Palestinian advocacy occurring at Columbia. The scenarios mentioned mirrored the precise forms of advocacy in which Palestinian, perceived-Palestinian, non-citizen and students associated with Palestinians were engaging: criticism of Israel's military conduct, criticism of the Israeli government, and criticism of policies and actions associated with a foreign state based on the national identity or background of individuals involved.

272. It was therefore clear to Member N that Defendants were using an updated Title VI policy to institutionally punish and retaliate against Palestinian, perceived-Palestinian, and non-citizen students, and those associated with Palestinians, who called out Defendants harassment of protected individuals.

273. The effect on Member N was immediate and practical. Because of the Title VI training, Member N was afraid that providing information to incoming students or engaging in discussion concerning the University's treatment of Palestinian, perceived-Palestinian, or non-citizen students would expose her to disciplinary

274. Following Mr. Khalil's detainment, Member N participated in the March 10, 2025 letter-writing campaign in the "fishbowl" part of SIPA's building that was organized by PWG.

275. On the glass windows in that space, PWG taped up two large printouts of pictures of Mahmoud. Along with Ms. Shaffer, Member N was fielding calls and requests for comment from media, often walking in and out of the building. At one point, Member N entered the building and saw that the posters had been removed, and that a security guard was arguing with Mr. Brooks.

276. Member N witnessed multiple PWG members telling the security guard that PWG

had spoken to Associate Dean Tsuya Yee that morning, and that she had given PWG approval to host the event. After some time had passed, the security guard told PWG members that they needed a stamp or signature from the Dean (presumably Dean Yarhi-Milo's). Dean Yee appeared shortly after and expressed that she was not aware of the rule requiring Dean Yarhi-Milo to sign off or stamp approval of on posters.

277. At the SIPA Gala on April 25, 2025, Member N was again confronted by SIPA students about her support of Mr. Khalil, who they characterized as dangerous. Alarmed by this unexpected confrontation and the disparaging way these students spoke of Mr. Khalil, Member N left the Gala in tears. This incident further caused her to feel unwelcome and unsafe in the class where she continued to be a TA.

## CAUSES OF ACTION

### COUNT I
### Violations of Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d.

***Defendants' Deliberate Indifference to a Hostile Environment for Palestinian, Perceived Palestinian, and Non-Citizen Students.***

278. Plaintiffs repeat and reallege the allegations of the preceding paragraphs as though fully set forth herein.

279. Title VI provides that "[n]o person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 42 U.S.C. § 2000d.

280. Defendants receive financial assistance from the United States Department of Education and are therefore subject to suit under Title VI of the Civil Rights Act of 1964.

281. The U.S. Department of Education defines the types of discrimination prohibited

under Title VI as including harassment based on a student's actual or perceived shared ancestry or ethnic characteristics, or citizenship or residency in a country with a dominant religion or distinct religious identity. As alleged herein, Defendants fostered an environment in which the continued harassment of Plaintiffs – both in their capacity as PWG members, and as individual students – based on their actual or perceived shared Palestinian ancestry was regularly tolerated and passively accepted.

282. Plaintiffs reported each instance of the harassment they faced to Defendants through the appropriate channels. Defendants never adequately investigated Plaintiffs' complaints, nor did they appropriately discipline the individuals responsible for the harassment.

283. Defendants' failure to respond to Plaintiffs' reports of harassment was clearly unreasonable; Defendants did absolutely nothing to respond to a known threat to Palestinian and perceived Palestinian students.

284. As a result of the harassment they faced at Columbia, Plaintiffs missed classes and exams, suffered extreme mental health crises, feared for their physical safety, and, in the case of Mr. Khalil, were deprived of their liberty and other fundamental rights. The harassment they endured was thus so severe, pervasive, and objectively offensive that Plaintiffs were unable to participate in and benefit from the full extent of their education at Columbia University.

285. The hostile environment which Defendants have fostered remains on Columbia University's campus as evidenced by the most recent sighting of the doxxing truck on March 2, 2026, and current students fear of organizing under PWG's name should its ongoing suspension be lifted.

286. Plaintiffs have been and will continue to be injured because Defendants have and will continue to deny equal access to the educational opportunities and benefits provided to other

students and alumni as a result of the hostile environment towards Palestinian students, perceived Palestinian students, and non-citizen students at SIPA.

287. Defendants' violations of Title VI are the actual, direct, and proximate causes of Mr. Khalil's, Mr. Zubairi's, PWG and its members' injuries.

288. As a result of the foregoing, Plaintiffs Mr. Khalil, Mr. Zubairi, and PWG and its members have suffered, and continue to suffer, substantial damages, in amounts to be determined at trial.

289. Plaintiffs are also entitled to appropriate injunctive relief under Title VI because Defendants have knowledge of, contributed to creating, and continue to be deliberately indifferent to, a hostile educational environment that is severe, persistent, and pervasive; there is no adequate or speedy remedy at law to prevent Defendants from continuing to discriminate against students on the basis of actual or perceived Palestinian national origin, and the harm Plaintiffs will otherwise continue to suffer is irreparable.

290. Plaintiffs are also entitled to attorneys' fees and costs pursuant to 42 U.S.C. § 1988.

## COUNT II
## Violations of Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d.

### *Defendants' Direct Discrimination and Disparate Treatment towards Palestinian, Perceived Palestinian, and Non-Citizen Students and Official Policy of Discrimination in OIE Proceedings*

291. Plaintiffs repeat and reallege the allegations of the preceding paragraphs as though fully set forth herein.

292. Title VI also prohibits an institution receiving federal funding from intentionally discriminating against individuals or subjecting them to disparate treatment on the basis of their race, color, or perceived or actual national origin.

293. Defendants themselves intentionally discriminated against Plaintiffs – both in their capacity as PWG members, and as individual students – because of their Palestinian and perceived Palestinian ancestry, including but not limited to: (1) when publicly accusing Plaintiffs of being violent, despite having not legitimate basis for doing so; (2) arbitrarily limiting PWG's ability to meet on-campus and organize events; (3) restricting Mr. Khalil from Columbia's Campus; (4) ignoring reports of Plaintiffs' discrimination and safety concerns; and (5) targeting PWG and its members through discriminatory disciplinary proceedings

294. Moreover, Defendants also treated individual PWG members, including Plaintiffs Mr. Khalil and Mr. Zubairi, less favorably than similarly situated students who did not share their protected characteristics or association with Palestinians. Defendants imposed disciplinary restrictions, limitations on campus participation, and other adverse consequences on Plaintiffs that they did not impose on similarly situated students. Defendants likewise treated PWG less favorably than similarly situated student organizations in disparately enforcing University policies governing student expression, organization, and discipline.

295. Defendants use of the OIE to selectively punish Palestinian, perceived-Palestinian, and non-citizen students amounted to an official policy of punishing such students who advocated for the protection of Palestinian students and reported the harassment those students faced. Such an official policy is an explicit violation of Title VI.

## COUNT III
## <u>Violations of Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d.</u>

### ***Defendants' Retaliation against Palestinian, Perceived Palestinian, and Non-Citizen Students, and those associated with Palestinians***

296. Defendants also deliberately retaliated against Plaintiffs for engaging in protected activity in violation of Title VI.

297. As explained by the U.S. Department of Education, Title VI additionally prohibits an institution receiving federal funding from retaliating against individuals, such as students who, pursuant to Title VI, attempt to "exercise their civil rights, oppose discrimination, [or] report discrimination[.]"

298. As set forth above, under Title VI, the term "discrimination" is interpreted as including harassment "based on a student's actual or perceived[] shared ancestry or ethnic characteristics, or citizenship or residency in a country with a dominant religion or distinct religious identity."

299. As such, Defendants, as recipients of federal funds, are subject to liability under Title VI to the extent they retaliated against Plaintiffs – both as members of PWG and in their individual capacities – for engaging in protected activities, such as advocating against and reporting harassment Plaintiffs were subjected to because of their national origins and/or perceived shared ancestry and/or association with a protected class.

300. As described herein, throughout the relevant time period, Plaintiffs, individually and in their capacity as PWG members, engaged in protected activity. For example, Plaintiffs:

> (a) filed reports with SIPA's Student Affairs Office and OIE relating to the on-campus harassment of PWG members;
>
> (b) met with SIPA's administrators to report and oppose the harassment they were being forced to endure;
>
> (c) publicized, through social media and public statements, the hostility they had been subjected to on SIPA's campus;
>
> (d) criticized, through PWG's Instagram account, the discriminatory public conduct of SIPA officials, including, but not limited to, Dean Yarhi-Milo and Professor Jacob Lew; and
>
> (e) raised Title VI concerns directly with the OIE during disciplinary proceedings.

301. Plaintiffs' protected actions were the motivation for Defendants' retaliation against them, both as individuals and in their capacity as PWG members.

302. Specifically, Defendants retaliated against Plaintiffs by subjecting them to materially adverse actions including, but not limited to,

> (a) launching meritless disciplinary proceedings and a temporary suspension against Mr. Khalil in April 2024, November 2024, January 2025, and February 2025;
>
> (b) initiating disciplinary proceedings against PWG in February 2025 in retaliation for PWG's intensified public advocacy regarding Mr. Khalil's detention;
>
> (c) on May 5, 2025 sending mass warning letters to PWG's board members in retaliation for PWG members' pro-Palestine advocacy in the SIPA WhatsApp Group chat;
>
> (d) issuing sanctions against PWG, pursuant to which PWG was required to disclose multiple of its members' identities and personal information, in July 2025;
>
> (e) indefinitely suspending PWG as a recognized student organization at SIPA in September 2025;
>
> (f) expanding the scope of PWG's indefinite expulsion to prohibit any Instagram activity in December 2025;
>
> (g) expelling a PWG member from SIPA in February 2026;
>
> (h) repeatedly refusing to investigate complaints of harassment and/or doxxing made by various individual PWG members; and
>
> (i) excluding Mr. Khalil from campus and from academic participation.

303. Defendants levied such sanctions, allegations, and suspensions with retaliatory intent in violation of Title VI. Not only does the temporal proximity between the aforementioned events and the protected activity establish retaliatory intent, so too does the pretextual nature of many of these allegations, and Defendants' repeated pattern of initiating such baseless allegations.

## COUNT IV
## <u>Violation of N.Y. Exec. Law § 296(4)</u>

### *Defendants' Permission of the Harassment of Palestinian, Perceived Palestinian, and Non-Citizen Students*

304. Plaintiffs repeat and reallege the allegations of the preceding paragraphs as though fully set forth herein.

305. New York Executive Law § 296(4) forbids an educational institution from "permit[ting] the harassment of any student . . . by reason of his race, color, religion, disability, national origin, citizenship or immigration status[.]"

306. Defendants constitute an educational institution for purposes of N.Y. Exec. Law § 296(4).

307. As alleged herein, Defendants fostered an environment in which the continued harassment of Plaintiffs – both in their capacity as PWG members, and as individual students – was, at the very least, regularly tolerated and passively accepted, if not actively encouraged. This harassment was based on Plaintiffs' perceived or actual identities as Palestinians and/or association with Palestinians.

308. As also alleged herein, Defendants themselves also harassed Plaintiffs – both in their capacity as PWG members, and as individual students – because of Plaintiffs' perceived and/or actual identities as Palestinians.

309. As such, Plaintiffs are also entitled to injunctive relief under New York Executive Law § 296; the harm that Plaintiffs have been, and will otherwise continue to be, subjected to is irreparable.

310. Additionally, Plaintiffs are entitled to attorneys' fees and costs pursuant to N.Y.

Exec. Law § 297(10).

**COUNT V**
**<u>Violation of N.Y. Exec. Law § 296(4)</u>**

***Defendants' Denial of Palestinian, Perceived Palestinian, and Non-Citizen Students of the Use of Educational Institution Facilities***

311. Plaintiffs repeat and reallege the allegations of the preceding paragraphs as though fully set forth herein.

312. New York Executive Law § 296(4) forbids an educational institution from "deny[ing] the use of its facilities to any person otherwise qualified . . . by reason of his race, color, religion, disability, national origin, citizenship or immigration status[.]"

313. Defendants constitute an educational institution for purposes of N.Y. Exec. Law § 296(4).

314. As alleged herein, Defendants repeatedly denied Plaintiffs – both individually and in their capacity as PWG members – use of Columbia's facilities based on Plaintiffs' perceived or actual identities as Palestinians, and/or association with Palestinians.

315. As such, Plaintiffs are also entitled to injunctive relief under New York Executive Law § 296; the harm that Plaintiffs have been, and will otherwise continue to be, subjected to is irreparable.

316. Additionally, Plaintiffs are entitled to attorneys' fees and costs pursuant to N.Y. Exec. Law § 297(10).

**COUNT VI**
**<u>Violation of N.Y. Exec. Law § 296(7)</u>**

***Defendants' Retaliation and Discrimination against Palestinian, Perceived Palestinian, and Non-Citizen Students, and those associated with Palestinians***

317. Plaintiffs repeat and reallege the allegations of the preceding paragraphs as though fully set forth herein.

318. New York Executive Law § 296(7) forbids an educational institution from "retaliat[ing] or discriminat[ing] against any person because such person has [ ] opposed any practices forbidden under this article[.]"

319. As alleged herein, Defendants retaliated against Plaintiffs for their opposition to and reporting of the discrimination of Palestinian, perceived-Palestinian, those associated with Palestinians, and non-citizen students at Columbia by launching meritless allegations of discrimination against them and subjecting Plaintiffs to OIE disciplinary investigations.

320. As such, Plaintiffs are also entitled to injunctive relief under New York Executive Law § 296; the harm that Plaintiffs have been, and will otherwise continue to be, subjected to is irreparable.

321. Additionally, Plaintiffs are entitled to attorneys' fees and costs pursuant to N.Y. Exec. Law § 297(10).

## COUNT VII

## Violations of New York City Admin. Code § 8-107(4)

### *Defendants' Harassment of and Discrimination against Palestinian, Perceived Palestinian, and Non-Citizen Students*

322. Plaintiffs restate the foregoing paragraphs as is set forth fully herein.

323. New York City Admin. Code § 8-107(4) prohibits places of public accommodation from subjecting individuals and organizations to discrimination or harassment – including based on actual or perceived race, creed, national origin, immigration or citizenship status.

324. Columbia constitutes a public accommodation because, in Defendants' own words,

"Columbia has an open campus" which non-students are permitted to access "at [their] leisure[.]"[20] Defendants' reinforced this stance as recently as September 7, 2026, when announcing that is was "expanding campus guest access" because "[o]penness, exchange, and engagement, with one another, with our neighbors, and with the wider world, are [] fundamental to who [Columbia] [is] as an institution and to [Columbia's] academic mission."[21]

325. The acts and omissions of Columbia and its administrators and other employees have subjected, and continue to subject, Plaintiffs to discrimination and harassment on the basis of their race and national origin, as well as citizenship status, that is severe and pervasive.

326. As such, Plaintiffs are entitled to injunctive relief under New York City Administrative Code § 8-107(4) and § 8-502; the harm that Plaintiffs have been, and will otherwise continue to be, subjected to is irreparable. Plaintiffs are also entitled to monetary relief for the harm that they have, and will otherwise continue to experience.

## COUNT VIII
## <u>Breach of Contract</u>

327. Plaintiffs repeat and reallege the allegations of the preceding paragraphs as though fully set forth herein.

328. Columbia University's Rules of University Conduct provide that "[t]he University has an obligation to assure members of its community that they can continue in their academic pursuits without fear for their personal security or other serious intrusions on their ability to teach and to study."

---

[20] *See Frequently Asked Questions,* Columbia University, Visitors Center https://visit.columbia.edu/content/frequently-asked-questions (last visited September 11, 2026).

[21] *See Important Updates Regarding Campus Access,* Columbia University, Office of the President (September 7, 2025) https://president.columbia.edu/news/important-updates-regarding-campus-access.

329. Columbia University's Anti-Discrimination and Discriminatory Harassment Policy additionally prohibits discrimination against any person because of their actual or perceived membership in, or association with, a "Protected Class." Protected Classes include race, citizenship status, religion, national origin "including shared ancestry, ethnic characteristics, or citizenship or residency in a country with a dominant religion or distinct religious identity," or "any other protected characteristic as established by law."

330. Columbia University's Anti-Discrimination and Discriminatory Harassment Policy also prohibits "Discriminatory Harassment" whereby an individual is subject to unwelcome conduct that contributes to a hostile environment that interferes with their ability to benefit from some aspect of the University's educational programs or activities "on the basis of the individual's actual or perceived membership in, or association with a Protected Class." Columbia University's Student Anti-Discrimination and Discriminatory Harassment Processes requires that, upon receiving a report of harassment, OIE, or the applicable disciplinary body, is required to acknowledge receipt of the complaint and then to either meet with the reporting student to gather additional information or to begin a formal investigative process.[22]

331. Plaintiffs relied on these promises as students by paying tuition to Columbia.

332. Under New York state law, the relationship between a student and a higher education institution is regarded as contractual in nature. As such, the terms of a higher education institution's student handbooks, university bulletins, regulations, codes, policies, and procedures are contractually enforceable upon receipt of tuition.

333. Accordingly, Defendants breached their express contracts with Plaintiffs when, as

---

[22] *See Student Anti-Discrimination and Discriminatory Harassment Process*, Columbia University, Office of Institutional Equity, https://institutionalequity.columbia.edu/sites/institutionalequity.columbia.edu/files/content/Flow%20Charts/Student_ADDH_Process_Flowchart.pdf (last visited September 11, 2026).

described herein, Defendants failed to provide Plaintiffs with a campus free from discrimination and/or harassment based on their membership in a protected class, and, when Plaintiffs reported such harassment, when Defendants failed to follow their own established investigative process.

334. As a proximate and foreseeable consequence of the foregoing breaches Plaintiffs Mr. Khalil, Mr. Zubairi, and PWG's student members, sustained damages, including, but not limited to, emotional distress, psychological damage, loss of future educational and career opportunities, reputational damages, economic injuries, and other direct and consequential damages.

335. As a result of the foregoing, Plaintiffs are entitled to damages in an amount to be determined at trial, in addition to pre-judgment interest, attorneys' fees, expenses, costs, and disbursements.

## COUNT IX
## Breach of the Implied Covenant of Good Faith and Fair Dealing

336. Plaintiffs repeat and reallege the allegations of the preceding paragraphs as though fully stated herein.

337. Defendants have breached the implied covenant of good faith and fair dealing implied in its contracts with students, including Mr. Khalil, Mr. Zubairi, and PWG's student members. Among other things, Defendants selectively apply or enforce their student handbooks, guidelines, policies, procedures, course catalogs, registration materials, bulletins, circulars, and regulations in bad faith and discriminatory way — improperly motivated by shared ancestry, race, ethnic characteristics, and/or national origin bias — treating incidents of abuse, harassment, and intimidation against Palestinian and perceived Palestinian students, including Plaintiffs Mr. Khalil, Mr. Zubairi, and PWG's student members, in a disproportionately lenient, tolerant, forgiving, and

nonchalant manner.

338. As a result of Defendants' breaches, Plaintiffs Mr. Khalil, Mr. Zubairi, and PWG's student members have been damaged, and continue to sustain substantial damages, in amounts to be determined at trial.

## COUNT X
## Promissory Estoppel

339. Plaintiffs repeat and reallege the allegations of the preceding paragraphs as though fully stated herein.

340. Defendants unambiguously promised to allow PWG to continue operating as a registered student organization at Columbia University pursuant to it maintaining good standing as a student organization on Columbia's campus as per the Rules of University Conduct.

341. Plaintiff PWG reasonably and foreseeably relied on Defendants' promise to allow the organization to continue operating on campus by maintaining bank accounts in the organization's name and continuing to function as an on-campus group.

342. Then, without any justification, Defendants indefinitely suspended PWG from operating at Columbia despite PWG satisfying all of its obligations.

343. PWG suffered real harm as a result of relying on Defendants' promise because it (1) no longer had access to its bank accounts, (2) could no longer plan on campus events, and (3) was no longer able to organize and pursue its stated goals.

344. As such, PWG is entitled to injunctive relief so as to avoid any further injustice.

## JURY TRIAL DEMANDED

Plaintiffs hereby demand a jury trial for all issues so triable.

## PRAYER FOR RELIEF

**WHEREFORE**, in light of the foregoing facts, Plaintiffs respectfully pray and request that this Court grant the following relief:

a. Injunctive relief enjoining Columbia University and its agents, including Dean Keren Yarhi-Milo in her official capacity, from violating Title VI, including by: (i) enjoining them from establishing, implementing, instituting, maintaining, or executing discriminatory policies, practices, procedures, or protocols; (ii) ordering that Columbia University and SIPA take all necessary and appropriate remedial and preventive measures against anti-Palestinian discrimination and harassment; and (iii) ordering Defendants to take all necessary and appropriate remedial measures to prevent further harm to name Plaintiffs Mahmoud Khalil and Mohammad Ibrahim Zubairi, including, but not limited to, by enjoining Defendants from barring these individuals from enjoying the benefits they are entitled to as Columbia alumni, such as being able to access Columbia's campus, including but not limited to the appropriate remedial measures to reinstate Mr. Khalil's access to Columbia's campus;

b. Injunctive relief to end PWG's probation and suspension, and to: (i) restore PWG's ability to host and assist with official and/or unofficial activities, including business meetings, member activities, and community and social events; (ii) restore PWG's ability to use Columbia University's name in advertisements, statements, and on social media; (iii) restore PWG's ability to reserve space and/or hold events on Columbia University's campus; (iv) restore all financial accounts associated with PWG; and (v) allow PWG to return to receiving financial assistance from the University;

c. Compensatory, consequential, and punitive damages in amounts to be determined at trial;

d. Statutory penalties;

e. Reasonable attorneys' fees, costs, and expenses;

f. Pre-judgment interest and post-judgment interest at the maximum rate allowable by the law; and

g. Such other and further relief as this Court deems just and proper.

DATED: November 18, 2026

Respectfully submitted,

MAHMOUD KHALIL, MOHAMMAD IBRAHIM ZUBAIRI, and SIPA PALESTINE WORKING GROUP

By their attorneys:

*/s/ Brittany S. Finley*
*(admitted pro hac vice)*


**BRITTANY S. FINLEY, ESQ.**
149 26th Street NW
Atlanta, GA 30309
(470) 598-6997 (phone)
brittanysfinley@gmail.com (email)


*/s/ William Reynolds*
*(admitted pro hac vice)*


**WILLIAM REYNOLDS LAW, LTD.**
33 N Dearborn St, Suite 1000
Chicago, IL 60602
(630) 600-9922 (phone)
bill@reynoldsand.com (email)


**ATTORNEYS FOR PLAINTIFFS**